**SO ORDERED.**

**SIGNED this 6th day of October, 2025.**



_____
Mitchell L. Herren
United States Bankruptcy Judge
_____

## DESIGNATED FOR PRINT PUBLICATION

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **IN RE:** | |
| **AMRO M. SAMY** | **Case No. 24-11169** |
| **DARLA G. SAMY,** | **Chapter 11** |
| **Debtors.** | |

### Memorandum Opinion and Order
### Denying Motion to Appoint Chapter 11 Trustee

Two related, unsecured creditors of Debtors Amro and Darla Samy ask this

Court to order the appointment of a trustee in Debtors' Chapter 11 case under 11

U.S.C. § 1104(a)(1) and (a)(2),[1] arguing cause exists for the appointment of a trustee

and that such appointment is in the interests of creditors. The strong presumption

in a Chapter 11 case is that a debtor remains in possession of its assets and

_____

[1] Future statutory references are to the Bankruptcy Code, title 11, unless otherwise
specified.

continues to operate its business during reorganization, restructuring, or liquidation. Replacement of the debtor with a trustee is an extraordinary remedy.

The moving creditors presented evidence focusing on potential claims Debtors may hold against their wholly or partially owned business entities, and relatedly, potential claims those business entities may hold against the individual Debtors. The movants assert those conflicts of interest, dealings with insiders, and additional failures to keep adequate records and make timely reports constitute gross mismanagement by Debtors.

The Court held an evidentiary hearing, has carefully considered the evidence presented in this fact-intensive inquiry, and denies the motion. The evidence failed to show cause exists as contemplated by § 1104(a)(1), or that such appointment is in the interests of creditors as contemplated by § 1104(a)(2). Both the maximization of estate assets for the benefit of all creditors and the orderly distribution of such assets in accordance with plans confirmed under the Bankruptcy Code are achievable with Debtors remaining as the debtor in possession, despite the possibility of claims between Debtors and their business entities. The motion to appoint a trustee[2] is denied in full.

---

[2] Doc. 135. Creditors Cairo of Western Kansas, LLC and Debt Recovery Services, Inc. are closely related entities as described more fully herein and have acted in unison throughout Debtors' case. The Court will therefore refer to the two entities jointly as "Cairo" unless a need for separate identification is needed. Cairo appears through attorneys Eric Lomas of Klenda Austerman LLC, Benjamin Jackson of Jackson Legal Group, LLC, R. Joseph Naus, of Wiener, Weiss & Madison, APC, and Ronald P. Pope of Ralston, Pope & Diehl, LLC. Debtors appear by their attorney David Prelle Eron of Prelle Eron & Bailey, PA.

2

## I. Background and Findings of Fact

## A. Debtors' Businesses and Relevant Relationships

Debtors Amro and Darla Samy are entrepreneurs and business owners. Mr. Samy was a key witness at the evidentiary hearing. His native language is Arabic. At times during the hearing Mr. Samy struggled to hear or understand questions as they were asked. With the assistance of assistive audio technology, and after some questions were repeated or explained by the questioning attorneys, the Court felt Mr. Samy understood the questions and gave reliable and complete responses.

For years Debtors operated their many businesses—some wholly owned, some jointly owned, as detailed more fully below—in what could charitably be called a fluid manner. If one business needed funds, another business transferred the required funds. If Debtors individually needed access to a business asset, they facilitated that access. So-called "loans" were regularly made between entities or between entities and the individuals, but rarely was a promissory note executed, or collateral pledged.[3] Debtors also made loans or gifts to their children and their preferred charities. This continued without issue while Debtors enjoyed success and experienced no outside pressures.

At some point in 2019, Mr. Samy and his sometimes business partner, Cecil O'Brate, had a falling out. Mr. Samy and Mr. O'Brate (or Mr. O'Brate's business entity, Cairo of Western Kansas, LLC ("Cairo")), co-owned or co-operated many

---

[3] For example, the Court heard repeated testimony from Mr. Samy about "loans in lieu of wages" that he received from an entity in the years preceding Debtors' bankruptcy. After clarifying testimony, the Court learned Mr. Samy was instead referring to member withdrawals from a business entity, that he claims Mr. O'Brate instructed him to facilitate.

3

entities in varying percentages.[4] The details of the various disputes between the two are not relevant to the pending motion unless detailed below but suffice it to say they disagreed about ownership and operational issues. In April 2020, Cairo filed the first of many suits between the parties in state court. Over the next several years, the litigation grew to eventually include at least eight state-court suits involving Debtors or their entities and another federal court lawsuit. Those state-court lawsuits have been removed to federal court and are now in front of this Court as adversary proceedings.[5]

For the purposes of the current motion, the following entities and individuals are those primarily discussed:

| Entity | Individuals involved and/or relevant relationship. |
|---|---|
| Samys OC, LLC | Mr. Samy purports to own 51% of this LLC with 49% owned by Cairo. Currently a Chapter 11 debtor. Operates four Old Chicago restaurants in Kansas. |
| S&O Investments, Inc. | Mr. Samy purports to own 51% of this corporation with 49% owned by Cairo. Currently a Chapter 11 debtor. Owns and operates residential units in Garden City, Kansas and owns two pieces of undeveloped real property. |
| American Warrior Construction, Inc. | 100% controlled by Mr. Samy, as either he or a trust in his name own all the shares of this entity and Mr. Samy is the president. Currently a Chapter 11 debtor. Formerly developed real property interests and contracted construction work on those and other properties. |

---

[4] Mr. O'Brate passed away in January 2024, and Cairo is now owned by Mr. O'Brate's estate.

[5] An adversary proceeding is a litigated matter arising during the pendency of a bankruptcy case. Federal Rule of Bankruptcy Procedure 7001 contains a non-exhaustive list of disputes that must be filed as adversary proceedings. A "proceeding to determine a claim or cause of action" removed from other courts pursuant to 28 U.S.C. § 1452 is an adversary proceeding under Fed. R. Bankr. P. 7001(j).

4

| Cairo | Owned by the Estate of Cecil O'Brate. Cairo has many interests in various business entities, including many with Mr. Samy in various percentages. |
|---|---|
| Debt Recovery Services, Inc. | A Missouri corporation associated with Mr. O'Brate and Cairo. Holder of claims against Debtors via assignment of those claims from either Commerce Bank or Dream First Bank. |
| M&T Excavation, LLC | Entity owned and operated by Ms. Samy's son/Mr. Samy's stepson, Trent Nevola. |
| Bank of Alexandria d/b/a AlexBank ("Alex Bank") | Debtors have a savings account and three Certificates of Deposit at this financial institution in Cairo, Egypt. |
| Dream First Bank | One of Debtors' primary secured creditors as to their individual debt and the debt of Debtors' relevant business entities. |
| First State Bank of Healy | Additional financial institution of Debtors. Neil Wilson is a Chief Lending Officer at this Bank and Debtors' primary contact there. |
| Walk-On's Enterprises Franchising, LLC | Franchising entity for Walk-On's Sports Bistreaux (Louisiana and sports themed restaurants). Both the operating restaurants and the franchising entity will be referred to herein as "Walk-On's." A Walk-On's is operating in Garden City, Kansas and one was or is contemplated in Manhattan, Kansas, as discussed below. |
| S&D Hospitality LLC | Debtors are co-equal sole members. Mr. Samy runs his restaurant management services through this LLC. |
| GC Restaurant Hospitality, LLC | Entity co-owned by Craig Boomhower and Scott Schneider (two individuals unrelated to Debtors). This LLC owns the franchise for the Walk-On's in Garden City, Kansas and paid the franchise fee to S&D Hospitality LLC for the franchise for a Manhattan, Kansas location of Walk-On's. Pays monthly compensation to Mr. Samy and S&D Hospitality LLC for Mr. Samy's work as the director of operations of the Garden City Walk-On's. |

## B. Debtors' Bankruptcy Filing

Many of the issues in the state court lawsuits involved the ownership or control over the entities jointly owned by Mr. Samy and Mr. O'Brate and/or Cairo. Several of the cases include claims by Samys OC, LLC and/or S&O Investments,

5

Inc. as nominal defendants against American Warrior Construction, Inc. or Mr. Samy.

In May 2024, Mr. O'Brate's entity, Debt Recovery Services, Inc., obtained an assignment of a loan agreement for which Mr. Samy and Mr. O'Brate had given individual guarantees. Debt Recovery Services, Inc. released the personal guaranty of Mr. O'Brate and then, on August 12, 2024, filed a federal complaint against Mr. Samy, alleging breach of Mr. Samy's commercial guaranty. As a result, Debtors began contemplating a bankruptcy filing as early as October 2024. On October 4, 2024, their legal counsel provided Debtors a list of the type of financial documents needed to prepare to file a bankruptcy petition. Mr. Samy was aware that all his assets and liabilities had to be disclosed in the bankruptcy process.

In one of the state court lawsuits summary judgment was entered against Debtors in favor of Dream First Bank—which later assigned that judgment to Debt Recovery Services, Inc. on October 24, 2024. The next week, on October 30, 2024, Mr. Samy forwarded the October 4, 2024, communication from his attorneys to Mr. Wilson at First State Bank of Healy. In early November 2024, Debt Recovery Services, Inc. succeeded in garnishing Debtors' accounts and sought to obtain charging orders against Debtors.

Facing increasing, outward pressure, Debtors, through counsel, filed their individual Chapter 11 bankruptcy petition on November 14, 2024, as a quick file, without supporting Schedules or their Statement of Financial Affairs. At the same

**6**

time, three of Mr. Samy's entities—Samys OC, LLC,[6] S&O Investments, Inc.,[7] and American Warrior Construction, Inc.[8] (referred to collectively as the Debtor Entities)—also filed Chapter 11 petitions. Debtors' bankruptcy estate includes the controlling interests of the three Debtor Entities and Mr. Samy is the primary executive officer for each of the Debtor Entities.[9] Debtors paid a prepetition retainer to their law firm for representation in their individual bankruptcy case and for representation in the Debtor Entity cases, and each Debtor sought approval of employment of the firm in each of the four cases. Debtors and the Debtor Entities also sought joint administration of the four bankruptcy cases.[10]

### C. Debtors' Schedules and Disclosures; Amendments and Walk-On's Franchise

Debtors agree they initially filed insufficient Schedules and supporting documents in their case, although they do point to extenuating circumstances. Cairo objected to the application to employ Debtors' counsel on December 6, 2024, and

---

[6] Case No. 24-11166.

[7] Case No. 24-11167.

[8] Case No. 24-11168.

[9] Although Cairo appears to be arguing in at least some of the litigation between the parties that Debtors' controlling interests and/or Mr. Samy's management rights are at issue, for purposes of this pending motion the Court is assuming the accuracy of Debtors' assertions, while understanding those assertions might be subject to later attack by Cairo.

[10] Doc. 17. In the motion for joint administration, Debtors stated: "Finally, because Debtors have many of the same debts, own property that is pledged as collateral for other debts, and rely on each other's income to pay regular expenses; the Debtors and Debtors' counsel believe that there will be no conflicts for the joint representation . . . of all entities. Additionally, because they share . . . similar assets and some of the same debts, there were loans and obligations that were owed between some of the Debtors. However, Debtors have agreed to forgo any collection on any such debt and waive recovery on those prepetition obligations to the extent it is necessary to obtain joint administration." *Id.* p. 5-6 ¶ 12. This "plan" was never put into fruition, and the Court denied the law firm's application for joint employment and denied the motion for joint case administration.

7

several additional motions (including the motion for joint administration) were contested early in the case. On December 13, 2024, nearly a month after Debtors' initial petition was filed, Debtors filed their initial Schedules, Statement of Financial Affairs, and related documents.[11]

The December 2024 Schedules disclosed Debtors' interest in two franchises (Old Chicago and Choice Hotels).[12] Debtors also initially disclosed one checking account (with an unknown value) and one certificate of deposit (with a $25,000 value) at Alex Bank in Cairo, Egypt.[13] The December 2024 Schedules also indicated a line of credit with First State Bank of Healy,[14] and listed that Bank as a secured creditor with collateral described as "Lake House and BMW."[15]

Amended Schedules were filed about a month later, on January 23, 2025.[16] Those amendments did not amend the Debtors' franchise interests, but did change as to the Alex Bank accounts. Regarding Alex Bank, Debtors disclosed one savings account with an account number ending in 6004, valued at $14,099.47, and three certificates of deposit, two valued at $39,750.60 each and one valued at $99,376.50.[17] Debtors also disclosed Alex Bank held secured claims of $24,370.61

---

[11] Doc. 66.

[12] *Id.*, p. 7 ¶ 27.

[13] *Id.*, p. 6 ¶ 17.

[14] *Id.*, p. 6

[15] *Id.*, p. 15.

[16] Doc. 92.

[17] *Id.*, p. 10 ¶ 17.

8

and \$23,924.16, secured by the certificates of deposit.[18] No pertinent additional details were given regarding the First State Bank of Healy.

The months following the January 2025 amendment saw significant changes in Debtors' and the Debtor Entities' cases. The Court heard two days of evidence on the application to employ the law firm for Debtors and the Debtor Entities. That application was ultimately denied as moot in Debtors' case because Debtors sought new counsel in their individual case.[19] The Court then entered a Memorandum Opinion and Order denying the applications for employment of the firm as bankruptcy counsel for the Debtor Entities, concluding the single law firm proposed as counsel did not meet the qualifications required by § 327 or the conflict-of-interest standards of the Kansas Rules of Professional Conduct.[20] An order was entered granting an application to employ new counsel in Debtors' case on March 17, 2025,[21] but new counsel was not employed in the Debtor Entity cases until April

---

[18] *Id.*, p. 15-16 ¶¶ 2.1 through 2.2.

[19] *See* Doc. 118 (notice of substitution of counsel); Doc. 181 (Order Mooting Application to Employ).

[20] *See* Case No. 24-11166, Doc. 121; Case No. 24-11167, Doc. 96; Case No. 24-11168, Doc. 113.

[21] Doc. 137.

**9**

through June 2025.[22] The Court also denied the motion for joint administration in each case.[23]

With new counsel employed, Debtors next filed amended Schedules on May 15, 2025.[24] This amendment was significant; it contained extensive additions, deletions, and changes to the Schedules as well as a ledger covering two-years' worth of transactions from Debtors' various accounts. As pertinent here, regarding Debtors' franchise interests, Debtors removed their interest in the franchises for Choice Hotels and Old Chicago, because those are not owned by Debtors individually, but are owned by K&S, LLC and Samys OC, LLC, respectively.[25] Regarding the Alex Bank savings account with account number ending in 6004, Debtors changed the value of that account on the petition date to $24,831.82.[26]

In the May 2025 amended Schedules, Debtors also disclosed additional transfers outside the ordinary course of business. Debtors reported that in 2024, they made two $20,000 loans to their son's business, M&T Excavation, LLC,[27] which were later repaid in full. Mr. Samy testified he had not previously disclosed these

---

[22] *See* Case No. 24-11166, Doc. 155 (Order Granting Application to Employ Colin N. Gotham, entered April 21, 2025); Case No. 24-11167, Doc. 147 (Interim Order Granting Application to Employ, entered June 3, 2025) and Doc. 152 (Agreed Final Order Granting Application to Employ Debtor Attorney, entered June 18, 2025); Case No. 24-11168, Doc. 143 (Order Granting Application to Employ Mark J. Lazzo and Justin T. Balbierz, entered April 15, 2025).

[23] Case No. 24-11166, Doc. 173; Case No. 24-11167, Doc. 149; Case No. 24-11168, Doc. 212; Case No. 24-11169, Doc. 215.

[24] Doc. 188.

[25] *Id.*, p. 2.

[26] *Id.*, p. 1.

[27] Doc. 188 p. 20.

**10**

loans because he had not understood that he needed to disclose a loan of funds that had been paid back in full. Regarding Dream First Bank and First State Bank of Healy,[28] Debtors disclosed that on January 24, 2023, they refinanced a loan from Dream First Bank secured by real property in Missouri with a loan from First State Bank of Healy in the amount of $312,000. Debtors disclosed that First State Bank of Healy recorded a deed of trust on the property on February 14, 2023, to secure the loan, and the refinance produced cash back to Debtors of $29,498.18. Debtors also disclosed that on June 15, 2024, a second deed of trust was executed in favor of First State Bank of Healy. Per Debtors' amendment:

> Initially, an amendment was executed to increase their existing line of credit from $30,000 (which had never been drawn on) to $200,000. Additionally, the Debtors hypothecated $200,000 of the deed of trust to collateralize a line of credit to Trent Nevola ([Ms. Samy's] son) in the amount of $200,000. That hypothecation was released on November 4, 2024. Simultaneously with the release, the debtors pledged their 2018 BMW to support the line [of credit] and the line of credit was increased to $400,000.[29]

This amendment was the first time Debtors disclosed these prepetition transfers with First State Bank of Healy.

Just prior to the evidentiary hearing, on July 24, 2025, Debtors again filed an amended Schedule G and Statement of Financial Affairs.[30] In the July 2025 amendments, for the first time Debtors disclosed their guaranty of a franchise agreement between Walk-On's and S&D Hospitality LLC for a Manhattan, Kansas

---

[28] *Id.*, p. 8.

[29] *Id.*

[30] Doc. 268.

11

location of Walk-On's that was not built, together with a confidentiality agreement and a non-compete agreement related to the same. Those agreements were executed on January 5, 2022. Debtors also disclosed that GC Restaurant Hospitality, LLC subsequently paid the $30,000 franchise fee to S&D Hospitality LLC for that franchise in November 2022, and the two LLCs had an oral contract for the franchise agreement to be transferred to GC Restaurant Hospitality, LLC. Debtors indicated their intent to reject any executory contract with Walk-On's.[31] At the time of the evidentiary hearing, the Manhattan, Kansas franchise agreement remained in the name of S&D Hospitality, LLC, although Mr. Samy testified both he and GC Restaurant Hospitality, LLC had discussed the transfer with Walk-On's, and Walk-On's had informally indicated it would approve a transfer when requested. Mr. Samy caused S&D Hospitality, LLC to obtain an extension from Walk-On's for deadlines in the franchise agreement in March 2024, on behalf of GC Restaurant, LLC. No Manhattan, Kansas Walk-On's exists beyond the franchise agreement.

Debtors' July 2025 amendment also disclosed that in December 2022, GC Restaurant Hospitality, LLC paid S&D Hospitality LLC "in exchange for a) reimbursement for expenses incurred in the franchise process,[32] and b) release from

---

[31] In their Periodic Report Regarding Value, Operations and Profitability of Entities in Which the Estate of Amro & Darla Samy Holds a Substantial or Controlling Interest, Doc. 179, Debtors did not include the franchise agreement for the Manhattan, Kansas Walk-On's location. Although the franchise agreement remains in his name, Mr. Samy testified he considers it to have been sold long before his bankruptcy petition was filed, and no longer the property of S&D Hospitality LLC.

[32] The testimony and exhibits indicated the total amount was $140,635.93, which was the amount S&D Hospitality, LLC had paid in franchise fees, architecture and engineering work, and consulting fees, related to the Walk-On's franchise agreements. The funds were deposited in S&D Hospitality, LLC's bank account on November 28, 2022.

all obligations to Walk-On's related to the Garden City, Kansas location."[33] The testimony and exhibits at the hearing clarified that S&D Hospitality, LLC executed the franchise agreement for the Garden City location prior to that exchange, on June 2, 2021, and Walk-On's approved the transfer to GC Restaurant Hospitality, LLC on December 16, 2022. Mr. Samy testified that following the sale to GC Restaurant Hospitality, LLC, he never considered that either he or S&D Hospitality, LLC held any further interest in either of the Walk-On's franchise agreements because both had been bought and paid for.

The July 2025 amendments also clarified the timeline and hypothecation of the First State Bank of Healy debt as follows:

- 1/24/23: First deed of trust executed between Debtors and the Bank.

- 5/8/2024: Debtors hypothecate their first deed of trust to the Bank to collateralize a line of credit to M&T Excavation, LLC and Trent Nevola for $200,000. Debtors also execute a guarantee on this date.

- 6/15/2024: Debtors execute a second deed of trust in favor of the Bank, to increase their line of credit from $30,000 to $200,000.

- 11/4/2024: Hypothecation and guarantee released because M&T Excavation LLC refinanced its underlying debt. At the same time, Debtors pledge their 2018 BMW to support their personal line of credit.

In other words, the May 2025 amended Schedules indicated the *second* deed of trust was hypothecated to support the line of credit for M&T Excavation, LLC. The July 2025 amendments revealed the contrary, only Debtors' *first* deed of trust had been hypothecated, not the second.

---

[33] Doc. 268 p. 1.

First State Bank of Healy has filed Proofs of Claim in Debtors' case in the combined total amount of $459,420.10.[34] The Bank's representative testified that the hypothecation and guaranty for the collateralization of the line of credit of M&T Excavation, LLC was fully released by the Bank prepetition, on November 4, 2024, and it was the Bank's position Debtors no longer had liability for the line of credit held by M&T Excavation, LLC. The Bank's representative also testified the Bank knew Debtors were contemplating a bankruptcy filing, and that it increased Debtors' personal line of credit in contemplation of postpetition financing. That request for postpetition financing was ultimately withdrawn and the line of credit frozen, but First State Bank of Healy continues to retain its lien on Debtors' BMW.

### D.    Debtors' Prepetition Insider and Intercompany Transfers

As noted above, Debtors often made prepetition transfers to family or their businesses. For example, in March 2024, the Debtor Entity American Warrior Construction, Inc. entered into a lease of certain construction equipment to M&T Excavation, LLC. The lease terms required payments of $5000 per month, less than the amount American Warrior Construction, Inc. was required to pay for its quarterly payment to Dream First Bank secured by the same equipment, which equipment also had a second lienholder. Mr. Samy testified he anticipated selling the equipment to M&T Excavation, LLC and closing on that sale prior to the next quarterly payment coming due. Ultimately the financing for the sale was delayed and, in the interim, American Warrior Construction, Inc. filed its bankruptcy

---

[34] Proof of Claim No. 10 and Proof of Claim No. 11.

petition. Postpetition, American Warrior Construction, Inc. sought to follow through with the sale of the equipment to M&T Excavation, LLC; however, after objections, the equipment was auctioned instead.[35] Debtors believe the lease terms align with market values; Cairo believes they do not. Neither party offered evidence regarding the fair market value for the lease of the equipment at issue.

Another prepetition payment concerning Debtors and their entities was noted above. Prior to filing, Debtors made a $50,000 payment to their law firm as a retainer for representation in their individual bankruptcy case and for representation in each Debtor Entity case. A significant portion of those funds have since been refunded to Debtors' estate through a compromise and settlement with that firm.[36]

The Debtors' Schedules and the Schedules of the Debtor Entities disclose additional prepetition transfers between and amongst Debtors and their Entities. The following are disclosed:

- During the one-year period prior to filing its petition, Samys OC, LLC made payments of $92,949.34 to American Warrior Construction, Inc.[37] These payments were purportedly, at least in part, for repair and construction work on the four Samys OC, LLC restaurant locations.

---

[35] *See* Case No. 24-11168, Doc. 102 (Debtor's Motion to Sell Equipment and Vehicles), Doc. 110 (Cairo Objection), Doc. 125 (Small Business Administration Objection), Doc. 126 (U.S. Trustee Objection), Doc. 160 (Debtor's Notice to Withdraw Doc. 102), Doc. 162 (Debtor's Motion to Sell Personal Property), Doc. 164 (Debtor's Motion to Establish Bid Procedures), Doc. 186 (Dream First Bank Limited Objection to Bid Procedures Motion), Doc. 193 (Cairo Objection to Motion to Sell and Motion to Establish Bid Procedures), Doc. 247 (Agreed Order on Debtor's Motion Authorizing Sale of Personal Property), Doc. 252 (Amended Order Approving Bid Procedures and Auction Procedures).

[36] *See* Doc. 244 (Motion for Intended Compromise), Doc. 297 (Order Granting Motion for Intended Compromise).

[37] Case No. 24-11166, Doc. 69 p. 67 (Statement of Financial Affairs ¶ 4.2).

15

- Samys OC, LLC owes Debtors $440,898.26,[38] and Samys OC, LLC is owed $341,632.64 from Mr. Samy.[39] The Schedule E/F of Samys OC, LLC also states Mr. Samy has a general unsecured claim against Samys OC, LLC in an unknown amount.[40] In the one-year prepetition period, Mr. Samy transferred $915,898.26 to Samys OC, LLC.[41] During the one-year period prior to filing its petition, Samys OC, LLC disclosed payments of $475,000 to Mr. Samy.[42]

- S&O Investments, Inc. disclosed a general unsecured claim held by American Warrior Construction, Inc. of $207,176.72.[43] During the one-year period preceding its bankruptcy petition, S&O Investments, Inc. made $70,624.17 in payments to American Warrior Construction, Inc.[44] The debt is the result of work performed by American Warrior Construction, Inc. on the S&O Investments, Inc. duplexes, and the payments were for work performed thereon and miscellaneous repair work.

- Debtors' Schedules state American Warrior Construction, Inc. owes Debtors $506,868.25.[45] The Schedules of American Warrior Construction, Inc. disclose Mr. Samy has a general unsecured claim, but for $522,143.25.[46] In the one-year prepetition period, Mr. Samy transferred $560,000 to American Warrior Construction, Inc.[47] In the one-year prepetition, American Warrior Construction, Inc. transferred $100,000 to Mr. Samy.[48]

---

[38] Doc 66 p. 8 (Schedule A/B ¶ 30).

[39] Case No. 24-11166, Doc. 69 p. 6 (Schedule A/B ¶ 71).

[40] *Id.,* Doc. 69 p. 48 (Schedule E/F ¶ 3.247).

[41] Doc. 66 p. 44 (Statement of Financial Affairs ¶ 7) and p. 46 (Samys OC LLC Transactions by Account As of December 13, 2024 for "2801- N/P Samy").

[42] Case No. 24-11166, Doc. 69 p. 67 (Statement of Financial Affairs ¶ 4.1) and p. 104 (Samys OC, LLC Vendor QuickReport January 1, 2023 through December 10, 2024 to Amro Samy).

[43] Case No. 24-11167, Doc. 59 p. 17 (Schedule E/F ¶ 3.2).

[44] *Id.* p. 25 (Statement of Financial Affairs ¶ 4.2).

[45] Doc. 66 p. 8 (Schedule A/B ¶ 30).

[46] Case No. 24-11168, Doc. 58 p. 15 (Schedule E/F ¶ 3.14).

[47] Doc. 66 p. 44 (Statement of Financial Affairs ¶ 7) and p. 45 (American Warrior Construction Inc. Transactions by Account As of December 13, 2024 for "N/P Samy").

[48] Case No. 24-11168, Doc. 28 p. 22 (Statement of Financial Affairs ¶ 4.1).

**16**

As to any alleged loan or payments, there are no loan documents memorializing the loans, nor any assets pledged as security for the loans. Rather, the transfers are memorialized in each Debtors' QuickBooks accounting program.

Similar to the disclosures, Proofs of Claim have been filed in the Debtors and Debtor Entity cases. In the Samys OC, LLC case, Debtors filed a claim for $440,898.26 for "loans,"[49] the same amount disclosed in the Schedules. In the American Warrior Construction, Inc. case, Debtors filed a claim for $522,143.22 for "loans,"[50] and Samys OC, LLC filed a claim for an "unknown" amount for "various claims and other legal theories to be determined."[51] None of the Debtor Entities has yet filed a claim in Debtors' bankruptcy case.

### E.  Mr. Samy's Testimony Concerning Income and Management Responsibilities Postpetition

Debtors were undeniably late filing required monthly operating reports prior to approval of counsel's employment.[52] However, since the Court approved employment of counsel in mid-March 2025, Debtors have filed the monthly operating reports in a much timelier manner, and always by the end of the month the reports are due.[53] Likewise, in the initial motion to appoint a trustee, Cairo

---

[49] Case No. 24-11166, Proof of Claim No. 15.

[50] Case No. 24-11168, Proof of Claim No. 8.

[51] *Id.*, Proof of Claim No. 9.

[52] *See* Doc. 128 (November 2024 report filed on March 7, 2025), Doc. 129 (December 2024 report filed March 10, 2025), Doc. 139 (January 2025 report filed March 17, 2025), Doc. 148 (February 2025 report filed March 25, 2025).

[53] *See* Doc. 172 (March 2025 report filed May 6, 2025, Doc. 180 (April 2025 report filed May 13, 2025), Doc. 226 (May 2025 report filed June 20, 2025), Doc. 285 (June 2025 report filed July 28, 2025), Doc. 314 (July 2025 report filed August 28, 2025), Doc. 322 (August 2025 report filed September 15, 2025).

alleged Debtors used entity credit cards postpetition for personal expenses. And again, after the Court approved employment of counsel, Debtors stopped that practice; further, no evidence about it was offered at the evidentiary hearing.

Debtors' postpetition income is stable. Ms. Samy lists her net income as $8652.02 per month from her employment, and Mr. Samy lists net income of $4262.30 per month.[54] Mr. Samy is also paid an additional $6000 per month from S&D Hospitality LLC,[55] which is paid that amount by GC Restaurant Hospitality, LLC to manage and operate the Garden City Walk-On's location.

Postpetition, Mr. Samy also obtained and then provided additional information about his funds at Alex Bank. Similar to Debtors' initial Schedules in December 2024, going back to 2019, Mr. Samy had disclosed one foreign deposit account and a certificate of deposit of $25,000 on his prior years' tax returns. Mr. Samy testified he lost access to the account after making the initial deposit and that his tax reporting was based on his old information. The account was initially funded with borrowed funds from Alex Bank, and is set up as a transactional account, used by the Bank to deposit earnings from the CDs and payment of interest on the loan. Those functions are automated by the Bank. Postpetition, Mr. Samy regained access to the Alex Bank account and thereafter amended his Schedules as to those accounts, as indicated above.[56] Despite his regained access, Mr. Samy has been

---

[54] Doc. 66 p. 35-36.

[55] *Id.*, p. 36.

[56] The U.S. Trustee filed a motion to compel compliance with § 345(b) related to the funds at Alex Bank. Doc. 85. The Court issued a Memorandum Opinion and Order on June 11, 2025,

18

unable to close or transfer the accounts, and testified his understanding after talking with Alex Bank is that he would have to physically be present at the Bank to close the account. The funds remain at Alex Bank and continue to increase in value.

The intercompany transfers and potential conflicts of interest were a significant focus of the testimony at the hearing. Mr. Samy was forthcoming, transparent, and credible in his testimony on the subject. On direct examination, he testified he did not believe the inter-debtor claims would cause conflict of interest issues because he would defer to each of his entity's counsel regarding the prosecution of claims. Mr. Samy later clarified that he understood he would ultimately be responsible for directing counsel, but he would rely on the advice of counsel for each estate to determine the course of action that was in the best interest of that estate. The Court is convinced Mr. Samy understands his duty as an officer of each estate, and that he understands the attorneys' roles in helping him make decisions based on the best interest of each estate. The Court also heard testimony or proffers from counsel for each Debtor Entity concerning their appropriate understanding of their role as an attorney of each estate and their fiduciary duties in that role.

---

concluding Debtors had not established cause to excuse compliance with § 345(b) and granting the U.S. Trustee's motion to compel. Doc. 216. Debtors were directed to "diligently pursue compliance with § 345(b) and work with the U.S. Trustee to ensure the requirements of § 345(b) are met." *Id.* p. 2. The parties have agreed to refrain from putting this matter back on the court's docket until after resolution of Cairo's motion to appoint a trustee.

19

### F. Procedural History of Motion to Appoint Trustee

Cairo filed the motion to appoint trustee on March 14, 2025.[57] Objections were filed by Debtors,[58] S&O Investments, Inc.,[59] and American Warrior Construction, Inc.[60] Dream First Bank filed a "Response in Support" of the motion,[61] indicating it thought it may be practical to have an independent trustee managing the affairs of the Debtor Entities because of lack of progress in the Debtor Entity cases, concern over a lack of monthly operating reports at that time, and allegations about Debtors' postpetition use of credit cards. Dream First Bank also noted, however, that it was concerned about delay from appointing a trustee, and additional layers of cost from a trustee, who would also likely want to retain individual counsel. Dream First Bank provided no evidence or argument at the hearing in support of the appointment of a trustee. The U.S. Trustee took no position on the motion and did not participate in the hearing.

The Court heard testimony or proffered testimony from counsel for each Debtor Entity concerning the contentious litigation posture of Cairo in each bankruptcy case. Counsel for the Debtor Entities testified about threats of lawsuits against them personally, delays in the Debtor Entity cases resulting from poor

---

[57] Doc. 135. Cairo filed a Supplemental Support Brief in July 2025, wherein it focused its primary argument on the conflicts of interest between Debtors and the Debtor Entities. Doc. 243. Cairo also noted Debtors filed documents with substantial omissions or inaccuracies although it recognized Debtors' Schedules and supporting documents had been amended.

[58] Doc. 175.

[59] Doc. 173.

[60] Doc. 177.

[61] Doc. 170.

communication, increased costs and legal fees in their cases, and Cairo using objections to employment as what the attorneys perceived to be leverage for other motions.

## II.     Analysis

### A.     Jurisdiction and Burden of Proof

A motion to appoint a trustee under § 1104(a) is a core proceeding under 28 U.S.C. § 157(b)(2)(A) ("matters concerning the administration of the estate"), over which this Court may exercise subject matter jurisdiction.[62] Venue is proper in this District.[63]

The appointment of a Chapter 11 trustee is an extraordinary step; it removes all rights, duties, and powers given to a debtor in possession.[64] Cairo, as movant, bears the burden of proof.[65] The party seeking this relief needs to overcome the strong presumption of leaving the debtor in possession of their affairs.[66] To do so, a party must demonstrate clear facts indicating the necessity of a trustee under either § 1104(a)(1) or (a)(2).[67]

---

[62] 28 U.S.C. §§ 1334(b), 157(a), (b)(1) and (b)(2)(G), and Amended Order of Reference, D. Kan. S.O. 13-1. *See also In re Plaza De Retiro, Inc.*, 417 B.R. 632, 634 (Bankr. D.N.M 2009) (motion to appoint a Chapter 11 trustee "is a core proceeding"); *In re Colo.-Ute Elec. Ass'n, Inc.*, 120 B.R. 164, 165 (Bankr. D. Colo. 1990) (same).

[63] 28 U.S.C. § 1409(a).

[64] *In re Railyard Co., LLC*, No. 15-12386-J11, 2016 WL 1254998, at *10 (Bankr. D.N.M. Mar. 30, 2016).

[65] *In re St. Louis Globe-Democrat*, 63 B.R. 131, 138 (Bankr. E.D. Mo. 1985) (moving parties "have the burden of proof to show that cause exists to justify the appointment of a trustee"); *In re Crescent Beach Inn, Inc.*, 22 B.R. 155, 159 (Bankr. D. Me. 1982) ("A party requesting such relief has the burden of proof.").

[66] *In re Celeritas Techs., LLC*, 446 B.R. 514, 518 (Bankr. D. Kan. 2011).

[67] *Rivermeadows Assocs., LTD.*, 185 B.R. 615, 617 (Bankr. D. Wyo. 1995).

21

Courts remain split on the burden of proof required of the movant. Several courts use a clear and convincing evidence standard;[68] others rely on a preponderance of the evidence standard.[69] The Tenth Circuit has yet to adopt a standard.[70] The clear and convincing standard is the majority approach. But despite this, the Bankruptcy Code does not directly support it.[71] Aware of this fact, other courts opt for the preponderance standard.[72] Those courts see guidance in *Grogan v. Garner*—where the Supreme Court considered the appropriate burden of proof on § 523(a)'s exceptions to debtor discharge based on the debtor's actual fraud.[73]

The *Grogan* Court concluded the lighter preponderance standard better aligned with Congress's intent for § 523(a) for a few reasons.[74] First, Congress's statutory silence as to a higher standard in the fraud-related portions of § 523 created a presumption that the lower standard used for § 523's other subsections would control.[75] Second—despite many States's use of the clear and convincing

---

[68] *In re Bayou Grp., LLC*, 564 F.3d 541, 546 (2d Cir. 2009); *In re G-I Holdings, Inc.*, 385 F.3d 313, 318 (3d Cir. 2004).

[69] *See, e.g.*, *In re Keeley & Grabanski Land P'ship*, 455 B.R. 153, 163 (B.A.P. 8th Cir. 2011) ("[W]e conclude that the proper standard for a party seeking the appointment of a Chapter 11 trustee is preponderance of the evidence."); *In re Golden Park Estates, LLC*, No. 14–12253 T11, 2015 WL 3643479, at *5 (Bankr. D. N.M. June 11, 2015) ("The Tenth Circuit has not adopted such a standard, and likely would use a preponderance of the evidence standard.").

[70] *In re Celeritas Techs., LLC*, 446 B.R. at 519.

[71] *Id.*

[72] *See, e.g., Tradex Corp. v. Morse*, 339 B.R. 823 (D. Mass. 2006) ("More general Supreme Court reasoning in the bankruptcy realm suggests that the reflexive endorsement of a demanding 'clear and convincing' evidentiary burden regarding trustee appointment under § 1104 is anomalous.").

[73] 498 U.S. 279, 287 (1991); 11 U.S.C. § 523(a).

[74] *Id.* at 291.

[75] *Grogan,* 498 U.S. at 286-88.

22

standard for common-law fraud-based claims—Congress regularly employed the preponderance standard in its other fraud-related legislation.[76] And third, the Supreme Court noted civil actions default to the clear and convincing standard only when "particularly important interests or rights are at stake," and those kind of rights weren't at stake in *Grogan*.[77] Courts relying on *Grogan* have extended this reasoning to § 1104(a).[78]

Cairo argues for the lower standard. Regardless, because the facts here do not warrant the appointment of a Chapter 11 trustee under the lower preponderance standard, the Court need not decide between the two standards.

## B.     The Debtor-in-Possession Generally, and § 1104(a)'s Alteration to that Scheme

In a Chapter 11 case, a debtor "remains in possession of its assets and continues to operate its business as it restructures or sells and attempts to formulate a reorganization plan."[79] Despite this default, the Code provides a process for the appointment of a trustee to operate a debtor's business affairs in § 1104(a). That section states:

(a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United

---

[76] *See id.* at 288–89 (providing a list of fraud-related federal statutes requiring the preponderance standard).

[77] *Id.* at 286 (citing *Herman & MacLean v. Huddleston,* 459 U.S. 375, 389–390 (1983) (holding that debt discharge is not a constitutional or fundamental right in Chapter 7).

[78] *In re Keeley & Grabanski Land P'ship,* 455 B.R. 153 (B.A.P. 8th Cir. 2011) (extending this reasoning to state that, while important, a debtor's ability to retain possession of its property also likely fails to rise to the level of a fundamental right envisioned by the *Grogan* Court).

[79] 7 *Collier on Bankruptcy* ¶ 1104.02 (Richard Levin & Henry J. Sommer eds., 16th ed.).

23

States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—

> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

As noted above, "[t]he appointment of a Chapter 11 trustee is an extraordinary remedy based on a strong presumption in favor of leaving the debtor in possession."[80] As one bankruptcy court noted, although "one would expect to find some degree of incompetence or mismanagement in most businesses which have been forced to seek the protections of chapter 11,'" the appointment of a trustee "was meant to be the extraordinary exception and not the rule."[81]

---

[80] *In re Celeritas Techs., LLC*, 446 B.R. at 518; *see also In re St. Louis Globe-Democrat*, 63 B.R. 131, 138 (Bankr. E.D. Mo. 1985) ("[T]he appointment of a trustee in a chapter 11 case is an extraordinary remedy. It is well established there is a strong presumption that a debtor in possession in a reorganization case should be permitted to continue to control and manage its estate."); *see also In re Paolino*, 53 B.R. 399, 401 (Bankr. E.D. Pa. 1985) ("The legislative history reveals that Congress intended that the case law 'flesh out' the bare language of § 1104(a) and 'defin[e] the circumstances in which a trustee should be appointed.' Nonetheless, there is a 'strong' presumption against the appointment of a chapter 11 trustee." (quoting H.R. Rep. No. 95–595, 95th Cong., 1st Sess. 234 (1977), reprinted in 1978 U.S. Code Cong. & Admin. News 5787, 6193 and *In re Harlow*, 34 B.R. 668 (Bankr. E.D. Pa. 1983))).

[81] *In re Gen. Oil Distrib., Inc.* 42 B.R. 402, 409 (Bankr. E.D.N.Y. 1984) (quoting *In re Anchorage Boat Sales, Inc.*, 4 B.R. 635, 645 (Bankr. E.D.N.Y. 1980)); *see also In re St. Louis Globe-Democrat*, 63 B.R. at 138 ("It is not sufficient to simply show that the debtor is heavily in debt or has exercised poor business judgment. After all, it is reasonable to assume that the majority of businesses that arrive in chapter 11 have exercised a certain degree of incompetence or mismanagement.").

24

Although appointment of a trustee is not routine and should not be taken lightly, a trustee should be appointed in an appropriate case where it is "'critical for the Court to exercise [the power] in order to preserve the integrity of the bankruptcy process and to insure that the interests of creditors are served.'"[82] Trustee decisions under § 1104(a) represent a balancing act:

> [I]n most cases, the debtor will have entered bankruptcy as a result of honest business reverses, and appointment of a trustee, with the attendant disruption of business management, would not benefit, and indeed might harm, creditors. A trustee unfamiliar with the business and its creditors will usually cause delay and expense learning facts and circumstances that the trustee needs to know in order to facilitate the debtor's reorganization. Nevertheless, . . . in some cases fraud, gross mismanagement, or other circumstances might be present under which the benefit of a trustee would outweigh the detriment. In view of this expressed purpose, it would seem that a court considering a motion to appoint a trustee should generally balance the benefit to be gained from such an appointment against the detriment to the reorganization effort and the rights of the debtor that may result from such an appointment.[83]

A debtor's prepetition activity may be considered when making the appointment decision.[84]

Cairo moves for appointment of a trustee under both § 1104(a)(1) and (a)(2).[85] "While an extraordinary remedy, once a bankruptcy court determines that "cause" exists for appointment of a trustee under section 1104(a)(1) or that appointment of a trustee would be in the best interest of creditors under section 1104(a)(2), it has no

---

[82] *In re Celeritas Techs., LLC*, 446 B.R. at 518 (quoting *In re Intercat, Inc.*, 247 B.R. 911, 920 (Bankr. S.D. Ga. 2000)).

[83] 7 *Collier on Bankruptcy* ¶ 1104.02[3][a] (discussing legislative history of § 1104).

[84] *In re Okla. Ref. Co.*, 838 F.2d 1133, 1137 (10th Cir. 1988) ("[P]repetition activity may be considered as part of a § 1104 determination.").

[85] Debtors do not dispute that Cairo is "a party in interest" under § 1104(a) who may request appointment of a trustee.

25

discretion but must appoint a trustee."[86] The analysis under either subsection is

fact intensive, and "section 1104(a) decisions must be made on a case-by-case

basis."[87]

## C.  Removal for Cause, § 1104(a)(1)

Although once "cause" is proven a court must appoint a trustee, "the court

retains considerable discretion to determine when evidence of fraud, dishonesty,

incompetence, mismanagement or other factors are sufficiently serious to constitute

'cause' requiring the appointment of a trustee."[88] Examples of cause listed in the

statute are "fraud, dishonesty, incompetence, or gross mismanagement of the affairs

of the debtor by current management, either before or after the commencement of

the case."[89] In other words, the alleged "cause" must be something significant.

Regarding appointment under § 1104(a)(1), courts note that some type of

misrepresentation or breach of duty is required: "cases usually involve some blatant

attempt by the debtor to deceive the creditors to the profit of the debtor and the

---

[86] *In re Sims*, 226 B.R. 284 (B.A.P. 10th Cir. 1997) (internal quotations omitted); *see also In re Okla. Ref. Co.*, 838 F.2d at 1136 ("Once the court has found that cause exists under § 1104, it has no discretion but must appoint a trustee."); *In re Celeritas Techs., LLC*, 446 B.R. at 518 ("The decision whether the facts establish cause under § 1104(a)(1) is vested in the court's discretion and will be reviewed under an abuse of discretion standard. The court is vested with even broader discretionary powers under § 1104(a)(2) and may consider equitable factors to determine whether a trustee is in the interests of the estate and its creditors. If the facts of the case support the appointment of a trustee under either subsection §§ 1104(a)(1) or (2), the court has no discretion, but must appoint a trustee.").

[87] *In re Sharon Steel Corp.*, 871 F.2d 1217, 1226 (3d Cir. 1989).

[88] 7 *Collier on Bankruptcy* ¶ 1104.02[3][b][iii].

[89] The list is not exhaustive. The examples given are just that: examples. *See In re Peak Serum, Inc.*, 623 B.R. 609, 620 (Bankr. D. Colo. 2020) (examples given in § 1104(a)(1) for cause are not limiting).

26

detriment of the creditors."[90] "Gross mismanagement suggests some extreme ineptitude on the part of management to the detriment of the organization. But it must rise above simple mismanagement to achieve the level envisioned by the Code. Some mismanagement exists in every insolvency case."[91]

### D.    Removal under § 1104(a)(2)

Under § 1104(a)(2), the court "shall" appoint a trustee if the appointment is "in the interests of creditors, any equity security holders, and other interests of the estate." Under this subsection, courts consider a "variety of factors:"

> [T]he debtor's ability to fulfill its duty of care to protect the assets, its duty of loyalty, and its duty of impartiality is at the base. Perceived dishonesty or the withholding of information supports the appointment of a trustee. One of the most fundamental and crucial duties of a debtor-in-possession upon the filing of a Chapter 11 petition is to keep the Court and creditors informed about the nature, status and condition of the business undergoing reorganization. Other factors may include (i) the overall management of debtor, both past and present, (ii) the trustworthiness of debtor's management, (iii) the confidence or lack thereof of the business community and of creditors in present management, and (iv) practical considerations, such as the benefits derived by the appoint of a trustee, balanced against costs.[92]

---

[90] *In re Mako, Inc.*, 102 B.R. 809, 812 (Bankr. E.D. Okla. 1988) (collecting cases).

[91] *Id.*

[92] *In re Celeritas Techs., LLC*, 446 B.R. at 520-21. Other bankruptcy courts have listed equitable factors such as "(i) the trustworthiness of the debtor; (ii) the debtor in possession's past and present performance and prospects for the debtor's rehabilitation; (iii) the confidence—or lack thereof—of the business community and of creditors in present management; (iv) the benefits derived by the appointment of a trustee, balanced against the costs of appointment." *In re Colo.-Ute Elec. Ass'n, Inc.*, 120 B.R. 164, 176 (Bankr. D. Colo. 1990) (citation omitted).

27

"Courts construing this subsection 'eschew rigid absolutes and look to the practical realities and necessities' of the record to determine whether the appointment of a trustee is in the best interests of the estate."[93]

### E. Analysis: The Court Concludes Appointment of a Trustee is Not Warranted under either subsection (a)(1) or (a)(2) of § 1104

The Bankruptcy Code recognizes a debtor's current management is generally in the best position to see it through the reorganization or liquidation process. As one treatise notes:

> The concept of the debtor remaining in possession recognizes that the debtor's managers are most familiar with the business and normally will be able to provide the most capable and efficient management during the chapter 11 process. In addition, continuation of the debtor's management encourages managers to be willing to commence a chapter 11 case at an appropriate time, without undue fear that they will be ousted upon commencement of the case. Moreover, the debtor in possession concept, coupled with the debtor's exclusive period for proposing a reorganization plan, enables the debtor to protect its interests and, to some extent, those of its owners and managers, during the reorganization process.[94]

The Court heard two days of testimony and viewed thousands of pages of exhibits in this Chapter 11 case. Apart from the prepetition dispute with Cairo, the Court has seen no evidence of acute financial stress. Without the postpetition continuation of the disputes with Cairo, the bankruptcy cases would appear to be straightforward. The scope of the information disclosed is significantly more complex than what is typically seen in an individual bankruptcy. What appears

---

[93] *In re Taub*, 427 B.R. 208, 227 (Bankr. E.D.N.Y. 2010) (quoting *In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 658 (Bankr. S.D.N.Y. 2006).

[94] 7 *Collier on Bankruptcy* ¶ 1104.02.

28

clear is that the primary driver of the Debtor and Debtor Entity bankruptcies is the business divorce between Messrs. Samy and O'Brate that has manifested itself in the multiple lawsuits. Mr. O'Brate's Cairo wants Mr. Samy replaced so it can deal, not with Mr. Samy, but with a new person running Mr. Samy's estate and acting as the controlling operational manager of the Debtor Entities that currently show Mr. Samy as the majority owner. In support of this effort, Cairo advances a few, primary arguments.

First, Cairo argues the prepetition transactions between Debtors and their business entities establish a conflict of interest that renders Debtors unable to serve as trustworthy or reliable fiduciaries. Cairo cites cases it claims indicate the presence of transactions between affiliated companies is sufficient cause for the appointment of a trustee under § 1104(a). The cases include factors supporting the appointment of a trustee such as unapproved postpetition transactions, dishonesty, or disregard for the bankruptcy process.[95]

---

[95] *See, e.g.*, *In re Grand Valley MHP, LLC*, No. 24-03431-5-PWM, 2024 WL 4615349, at *15-16 (Bankr. E.D.N.C. Oct. 29, 2024) (finding poor business judgment, testimony indicating the management did not know details and did not care, a "lack of interest or regard for" the accuracy of Schedules, in addition to the interrelationship between affiliates all "controlled by one individual who has a substantial financial interest in being repaid for his investment"); *In re Klaynberg*, 643 B.R. 309, 319, 321, 323 (Bankr. S.D.N.Y. 2022) (concluding the debtor's divorce "strongly resembled" a sham agreement and may be fraudulent, there were postpetition transfers "transfers of assets in order to put them out of creditor's reach," and "a series of suspect transactions with family members or related entities before and during the bankruptcy proceedings"); *In re Sillerman*, 605 B.R. 631, 636, 647 (Bankr. S.D.N.Y. 2019) (case commenced as an involuntary Chapter 7 against individual debtor and later converted to Chapter 11; bankruptcy court appointed trustee in part due to "ample evidence" the debtor was "conflicted and is unwilling or unable to act in the best interest of his creditors and the estate," there was "ample undisputed evidence of unauthorized transactions between the Debtor and non-debtor affiliated entities," and "the Debtor has made repeated unauthorized post-petition payments"); *In re Ridgemour Meyer*

**29**

The evidence presented at the hearing does not support such a finding. There are undoubtedly significant prepetition transfers between Debtors and the Debtor Entities or insiders. But the transfers are disclosed, and Debtors have committed to seeking the advice of counsel as to those prepetition transactions. There have been no postpetition transactions of the same nature. Although there are a number of transactions and relationships between the bankruptcy estates that could provide potential ground for fatal conflicts, there has so far been no showing of fraud, dishonesty, or other factors like those present in the cases cited by Cairo.[96] The Court concludes the mere presence of interdebtor conflicts in these bankruptcies is insufficient to establish cause under § 1104(a)(1) or to justify appointment under § 1104(a)(2) where there is no evidence the debtor is not currently maintaining neutrality—"interdebtor conflicts . . . are present in many, if not most, large multi-debtor cases."[97]

---

*Props., LLC*, 413 B.R. 101, 113 (Bankr. S.D.N.Y. 2008) (noting a trustee "should be appointed under § 1104(a)(2) when they suffer from material conflicts of interest, and cannot be counted on to conduct independent investigations of questionable transactions in which they were involved" and concluding the principal was "not a trustworthy fiduciary"); *In re Intercat, Inc.*, 247 B.R. 911, 922-23 (Bankr. S.D. Ga. 2000) (trustee appointed where management was guilty of dishonesty, mismanagement, incompetence, self-dealing, waste of corporate assets and breach of fiduciary duty, and regarding conflicts of interest, there was no suggestion "he is or will be capable of pursuing the aggressive, independent investigation of all the transactions in issue, or that he will prosecute litigation to recover assets, or sue for the damages sustained by the debtor"); *In re Rivermeadows Assocs., Ltd.*, 185 B.R. 615, 618 (Bankr. D. Wyo. 1995) (trustee appointed in part because of the "disregard for the judicial process" and the lack of evidence to support complicated prepetition financial transactions between the debtor and other related entities).

[96] *Contra In re Mako, Inc.*, 102 B.R. 809, 812 (Bankr. E.D. Okla. 1988) ("These cases usually involve some blatant attempt by the debtor to deceive the creditors to the profit of the debtor and the detriment of the creditors.").

[97] *In re Adelphia Commc'ns. Corp.*, 336 B.R. at 657. *See also In re Sletteland*, 260 B.R. 657, 672 (Bankr. S.D.N.Y. 2001) ("[O]n a motion for the appointment of a trustee, the focus is on

Cairo also notes no claims have been filed by Samys OC, LLC or S&O Investments, Inc. in Debtors' case, contending if nothing else, there should be claims related to the derivative actions from the state court lawsuits it brought. No claims have been waived between any of the estates either, and Mr. Samy and counsel for each Debtor Entity have committed to ensuring claims will be pursued if appropriate. It appears from the testimony of the attorneys for the Debtor Entities that their analysis of these issues might have been delayed in part by the ongoing skirmishes between Cairo and the various estates. Each estate, and therefore the Court, will necessarily address interdebtor claims in the plan confirmation process.

Second, with regard to Debtors' transactions with insiders, particularly Debtors' son's business, M&T Excavation, LLC, the Court sees no behavior justifying appointment of a trustee. Prepetition, Debtors loaned relatively small amounts of money and M&T Excavation, LLC paid that money back. Debtors also guaranteed the line of credit taken by M&T Excavation, LLC at First State Bank of Healy. American Warrior Construction, Inc. also leased a portion of its equipment to M&T Excavation, LLC for an amount Cairo contends is below market value. The prepetition loans were small in amount and paid back in full months before Debtors' petition was filed. Although not initially disclosed, that disclosure failure was remedied. The pledge of collateral with First State Bank of Healy was likewise not an overall harm to Debtors' estate. The total debt owed by Debtors to that Bank was

---

the debtor's current activities, not past misconduct. Speculation that a debtor may do something in the future does not overcome the strong presumption that the debtor should be permitted to remain in possession in a Chapter 11 case or justify the additional costs of a trustee.").

31

small and the hypothecation agreement was released prepetition. Regarding the lease of equipment, contrary to Cairo's argument, just because the payment for a lease on equipment is less than the amount of note payments on that equipment does not mean the lease was not fair market value. Debtors often owe more on pledged collateral than the collateral is worth, and the Court was not presented with any evidence about the fair market value of the lease.

Third, regarding Debtors' alleged failure to keep adequate records or to make timely disclosures required by the Schedules or to file timely monthly operating reports, Cairo argues there is no excuse for the substantive omissions that were initially made in Debtors' Schedules and supporting documents, noting Debtors did have counsel at the time, just not counsel that had been approved by the Court. The Court acknowledges the concern that Debtors either did not initially take their bankruptcy filing seriously, or did not spend the needed time to ensure each filing was accurate and complete. However, the Court also takes judicial notice that Debtors' initial choice of counsel for themselves and the Debtor Entities was almost immediately opposed as having conflicts of interest. Those alleged conflicts led to extensive briefing and an evidentiary hearing and resulted in the Court's refusal to approve retention of that counsel. It is understandable that during that time frame and immediately after separate counsel was retained, Debtors' filings were not perfect.

The May 2025 amendments completed after Debtors' current counsel was approved are comprehensive. Debtors obviously spent significant time and funds

completing a thorough accounting of all transactions amongst their significant personal and business interests. Such an accounting would be daunting for any debtor, let alone a debtor with the breadth and scope of interests held by Debtors here. Debtors have competent counsel in their individual case and in each of the Debtor Entity cases. They are timely filing monthly operating reports. The Court expects this to continue, and if it does not, then the U.S. Trustee or any other party may seek appointment of a trustee or dismissal in the future, if they believe such exceptional relief would be warranted.[98] Although there was some failure to fully disclose at the beginning of Debtors' case,[99] the Court sees no evidence of gross mismanagement, inability to fulfil Debtors' duties, or purposeful withholding of information.[100]

---

[98] *See, e.g.*, *In re Crescent Beach Inn, Inc.*, 22 B.R. 155, 160 (Bankr. D. Me. 1982) ("The court is concerned with the debtor's violation of Local Rule 2007(b)(2). . . . Furthermore, there is evidence that the debtor has not timely filed all required reports with the United States Trustee. Such violations are serious, and, if continued, may well warrant the appointment of a trustee. . . . . The court expects that the debtor will file required reports in a timely fashion with the United States Trustee. Because the Bankruptcy Code adopts a flexible standard for appointment of trustees, the court is not prepared to adopt a per se rule that any violation of the local rules constitutes gross mismanagement." (internal quotation and citations omitted)).

[99] Additional examples of changing disclosures are Debtors' disclosure of their assets at Alex Bank and the First State Bank of Healy disclosures. Specifically regarding the Alex Bank assets, while the amounts and makeup of the accounts were not disclosed in the original Schedules, Mr. Samy provided the information he had and worked to obtain additional information, which was disclosed once he received it. Regarding the First State Bank of Healy, the amount of the debt, the security interest securing that debt, and the lack of an outstanding pledge in favor of M&T Excavation, LLC were all disclosed on the petition date. Clarifying additions were made, and the Court sees no purposeful attempt to mislead.

[100] *See In re Mako, Inc.*, 102 B.R. at 812 ("Gross mismanagement suggests some extreme ineptitude on the part of management to the detriment of the organization. But it must rise above simple mismanagement to achieve the level envisioned by the Code.").

Finally, Cairo contends the Walk-On's franchise agreement should have been disclosed earlier, that there is a conflict of interest between Samys OC, LLC and a Walk-On's (the Garden City franchise), and that Debtors' estate wasted another aspect of the asset (the Manhattan franchise). Cairo argues Debtors have therefore engaged in gross mismanagement of the estate.

On this point Cairo presented testimony about the Walk-On's franchise in Garden City, Kansas. Samys OC, LLC operates an Old Chicago restaurant in Garden City, Kansas, and one of the lawsuits between Cairo and Mr. Samy faults Mr. Samy for competing with that restaurant through his work at the Garden City, Kansas Walk-On's location. Cairo presented the Old Chicago franchise agreements and their terms requiring the operating principal of the franchise (whether that was Samys OC, LLC or Mr. Samy) to devote full time, best efforts to the supervision and management of the restaurant. But whether Mr. Samy violated any duty he had by being personally involved in more than one business at the same time or whether his understanding with Mr. O'Brate and their jointly owned entities on this question made Mr. Samy's roles entirely acceptable is far beyond the scope of this current motion. It is instead an issue for exploration in that litigation, where a full record can be developed. This isolated evidence about the terms of a franchise agreement is wholly insufficient to prove cause exists to appoint a trustee to replace the debtor in possession.

Regarding the Manhattan franchise, Cairo argued that Mr. Samy's failure to disclose and pursue business from a possible Manhattan franchise location provides

cause to replace him with a trustee. The evidence showed Mr. Samy and the other parties involved considered the unused franchise rights to have been sold to a third party about two years before the bankruptcy petitions were filed, and although a documented, formal approval from the franchisor was not obtained, the franchisor knew of the purported sale and expressed no objection. S&D Hospitality LLC does not include the franchise as an asset on its books, reflecting instead that it sold its rights to the Manhattan location and that it was paid for the sale. Cairo presented no persuasive evidence that Mr. Samy mismanaged the asset prepetition or postpetition to a degree sufficient to show cause for his replacement. At worst, the evidence thus far developed shows that he failed to understand the need to properly document and obtain formal approval for what everyone involved seemed to believe was a final sale.

Mr. Samy and Cairo have been involved in litigation for years now. Cairo made significant efforts before these related bankruptcies were filed to remove Mr. Samy from the entities in which the parties hold a joint interest. Cairo's motion to appoint a trustee has the appearance of being another effort in that endeavor, this time in bankruptcy court. Substituting a trustee at this time would add even more cost and time to the resolution of these multiple bankruptcies and the related litigation. A new trustee would simply be yet another person caught in the middle of the multiple accusations of wrongdoing between Debtors and Cairo.

## III.   Conclusion

The court must use its discretion to determine whether cause exists under § 1104(a)(1).[101] Only if the facts demonstrate cause, then the court "shall" grant relief.[102] Based on the above analysis, the Court concludes cause has not been shown and declines to appoint a trustee under § 1104(a)(1). The Court also concludes the totality of the circumstances does not show appointment of a trustee is in the best interests of the estate under § 1104(a)(2). There is insufficient evidence in the record to show Debtors will be or have been unable or unwilling to fulfill their duty to protect estate assets and there is insufficient evidence of dishonesty or purposeful withholding of information. Significantly, there is insufficient evidence Debtors are mismanaging their business interests. Cairo undoubtedly lacks confidence in Debtors' ability to successfully manage the cases and the business interests, but no other creditors appear to share that concern.[103] The Court will address Cairo's substantive disputes with Debtors or the Debtor Entities as they arise in the four bankruptcies and their related adversary proceedings, and if sufficient evidence develops later showing Debtors should be

---

[101] *In re Keeley & Grabanski Land P'ship*, 455 B.R. 153, 163 (B.A.P. 8th Cir. 2011).

[102] 11 U.S.C. § 1104(a); *see also In re Okla. Ref. Co.*, 838 F.2d 1133, 1136 (10th Cir. 1988).

[103] The response brief of Dream First Bank to the motion to appoint a trustee, Doc. 170, did provide tepid, initial support for a trustee in the Debtors' individual case, but then proceeded to point out many potential complications that might be expected to result from such an appointment. Dream First Bank provided no argument or evidence at the hearing in support of the appointment of a trustee. *Contra In re Grand Valley MHP, LLC*, No. 24-03431-5-PWM, 2024 WL 4615349, at *15-16 (Bankr. E.D.N.C. Oct. 29, 2024) (noting "all of the participating creditors . . . support the appointment of a trustee" and "[n]one of the creditors have confidence in Mr. Bender's ability to fulfill his fiduciary duty to the estate based on his history of paying himself first, coupled with his inability to answer questions about the financial workings of the Debtors").

36

replaced by a trustee pursuant to § 1104(a), the issue can be raised at that time.

The motion to appoint a trustee[104] is denied.

**It is so Ordered.**

###

---

[104] Doc. 135.