**SO ORDERED.**

**SIGNED this 27th day of October, 2025.**



_____
Mitchell L. Herren
United States Bankruptcy Judge
_____

### DESIGNATED FOR ONLINE PUBLICATION

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF KANSAS

IN RE:

AMRO M. SAMY                                    Case No. 24-11169
DARLA G. SAMY,                                  Chapter 11

                          Debtors.

### Memorandum Opinion and Order
### Overruling Objection to Exemptions in Part

Creditors of Debtors Amro and Darla Samy object to the exemption of a

vehicle, jewelry, and four life insurance policies from Debtors' Chapter 11

bankruptcy estate. Because each of these exemptions falls within the contours of the

applicable Kansas exemption statute, the Court overrules the objection to those

exemptions.[1] However, a $60,000 postpetition policy loan is not exempt under Kan.

---

[1] Debtors appear by their attorney David Prelle Eron of Prelle Eron & Bailey, PA. Creditors
Cairo of Western Kansas, LLC and Debt Recovery Services, Inc. appear through their

Stat. Ann. § 40-414, so the objection to any claim of exemption to that $60,000 is granted. The Court therefore overrules in part the objection to exemptions.[2]

## I.    Procedural History

Debtors filed a Chapter 11 bankruptcy petition on November 14, 2024, and their Schedule C[3] claimed an exemption in the following items of personal property:

- 2018 BMW M6, with an estimated value of $52,000, exempted under Kan. Stat. Ann. § 60-2304(c);

- Amro Samy's "wedding ring, watch[es],[4] costume jewelry," with an estimated value of $15,000, exempted under Kan. Stat. Ann. § 60-2304(b);

- Darla Samy's "wedding ring, watch, costume jewelry," with an estimated value of $25,000, exempted under Kan. Stat. Ann. § 60-2304(b).[5]

Additional exemptions were then claimed in several "Prudential Life Insurance" policies, but account numbers were not given, and for two of the three policies listed, no values were known.[6]

---

attorneys Eric Lomas of Klenda Austerman LLC, Benjamin Jackson of Jackson Legal Group, LLC, and R. Joseph Naus, of Wiener, Weiss & Madison, APC.

[2] Doc. 126 (Objection to Property Claimed by the Debtors as Exempt and Incorporated Memorandum), Doc. 218 (Amended and Restated Objection to Property Claimed by the Debtors as Exempt and Incorporated Memorandum).

[3] Doc. 66. Debtors filed their Chapter 11 bankruptcy petition as a quick file, without supporting Schedules or their Statement of Financial Affairs. About a month after the initial petition was filed, Debtors filed their Schedules, Statement of Financial Affairs, and related documents.

[4] Debtors' Schedule C contains a typo by exempting "watche [sic]," and as result, it is unclear if Debtors intended to type the singular "watch" or multiple "watches." *Id.* p. 12.

[5] *Id.* p. 12-13.

[6] *Id.* p. 13 (claiming exemption in (1) a Prudential Life Insurance Policy (whole life) Cash Value Beneficiary: Amro Samy, valued at $151,627.36, exempted under Kan. Stat. Ann. § 40-414, § 60-2313(a)(7), and § 40-258; (2) a Prudential Life Insurance Policy (Whole) Cash Value Beneficiary: Darla Samy, with an unknown value, exempted under Kan. Stat. Ann. § 40-414, § 60-2313(a)(7), and § 40-258; and (3) Prudential Life Insurance Policy (Whole) Cash Value Beneficiary: Darla Samy, with an unknown value, exempted under Kan. Stat. Ann. § 40-414, § 60-2313(a)(7), and § 40-258)).

2

Amended Schedules were filed on January 23, 2025. The Schedule A/B identified the following life insurance policies:

- Prudential Life Insurance Policies and Surrender/Refund Cash Values XXX802, beneficiary Darla Samy, value of $25,173;

- Prudential Life Insurance Policies and Surrender/Refund Cash Values XXX502, beneficiary Darla Samy, value of $473,583;

- Prudential Life Insurance Policies and Surrender/Refund Cash Values XXX520, beneficiary Darla Samy, value of $254,808; and

- Prudential Life Insurance Policies and Surrender/Refund Cash Values XXX591, beneficiary Darla Samy, value of $128,110.[7]

A new Schedule C was not filed, however.

Related creditors Cairo of Western Kansas, LLC and Debt Recovery Services, Inc. (hereinafter referred to as "Cairo") objected to the claimed exemption of the 2018 BMW M6, both Debtors' jewelry, and all life insurance policies.

Debtors next filed amended Schedules on May 15, 2025. Regarding Debtors' life insurance, the Amended Schedule C gave additional detail about Debtors' claimed exemptions:

- Prudential Life Insurance Whole Life Policy XXX802; Issued 8/9/20; Owner: Amro Samy; Beneficiary: Darla Samy; Death Benefit: $250,000 (plus contract fund value of $129,682.71 on 3/13/25); Surrender Value - $123,224.33 on 3/13/25.

- Prudential Life Insurance Whole Life Policy XXX502; Issued 8/21/20; Owner: Amro Samy; Beneficiary: Darla Samy; Death Benefit: $1,500,000 (plus contract fund value of $496,049.93 on 3/13/25); Surrender Value - $397,828.33 on 3/13/25.

- Prudential Life Insurance Whole Life Policy XXX520; Issued 8/15/20; Owner: Amro Samy; Beneficiary: Darla Samy; Death Benefit: $500,000 (plus contract

---

[7] Doc. 92 p. 12.

fund value of $258,594.48 on 3/13/25); Surrender Value - $245,793.23 on 3/13/25.

- Prudential Life Insurance Whole Life Policy XXX591; Issued 8/18/20; Owner: Amro Samy; Beneficiary: Darla Samy; Death Benefit: $250,000 (plus contract fund value of $130,006.48 on 3/13/25); Surrender Value - $123,548.10 on 3/13/25.[8]

All these were claimed exempt "100% of Value." Cairo then filed an amended, expanded objection.[9] Prior to the evidentiary hearing Cairo filed a Trial Brief, narrowing the disputes to the exemptions addressed above.[10]

## II.  Findings of Fact

### A.  Jewelry

Cairo's objection to the exemption of Debtors' jewelry argued the value of the jewelry exceeded what is permissible for such exemptions under the Kansas statute. At the start of the evidentiary hearing, both parties agreed Debtors' exemption of jewelry is limited to $1000 per Debtor, per Kan. Stat. Ann. § 60-2304(b).[11] As a result, the Court will not address this exemption further.

### B.  The 2018 BMW

Debtors live in Garden City, Kansas. At their Garden City home, they have a 2024 Tahoe, which they leased in January 2024, and a 2024 Denali, which was

---

[8] Doc. 189 p. 4.

[9] Doc. 218. In this amended objection, Cairo also objected to the exemption of certain retirement accounts, but because those exemptions are no longer at issue, the Court does not address them.

[10] Doc. 313. Cairo's Trial Brief limited the objection from all life insurance policies to the four life insurance policies detailed herein.

[11] Per Kan. Stat. Ann. § 60-2304(b), "Ornaments of the debtor's person, including jewelry, having a value of not to exceed $1,000" are exempt.

4

purchased in 2024 by an entity called S&D Hospitality LLC, in which Debtors are the only members.

Debtors also own a home in Manhattan, Kansas. The Manhattan home is not their permanent residence and is not claimed exempt as Debtors' homestead. Mr. Samy testified that years ago he and Ms. Samy used the 2018 BMW often at their home in Garden City. Then in 2023, Debtors moved the BMW to their Manhattan home so they could each have a vehicle to use when they were there.

Debtors visit their Manhattan home two to three times a month, for a total of about four to five days a month. Mr. Samy owns 51% of Samys OC, LLC, which operates four Old Chicago restaurants in Kansas. One of those four restaurants is in Manhattan, and two of the four are in towns neighboring Manhattan (namely, Salina and Lawrence). Mr. Samy regularly drives the vehicle around Manhattan, to the Manhattan restaurant, or to Salina or Lawrence to visit the restaurants in those cities.[12]

On average, Mr. Samy estimates he drives the BMW about eight to ten times a month. Mr. Samy testified that Ms. Samy also drives the BMW a similar amount, although only for personal use. Debtors estimate they drive the vehicle about two thousand miles per year.

---

[12] The Lawrence location of the Samys OC, LLC restaurant business closed a couple of weeks prior to the evidentiary hearing and is currently for sale.

5

## C.    Life Insurance Policies

The parties have a long, prepetition, litigation history—generally regarding business interests co-owned between them in varying percentages. Cairo filed the first state-court suit between the parties in April 2020. At that time, Mr. Samy had term life insurance policies, two of which had been in place since August 2014 and two that had been in place since October 2015. The face amount of the death benefits for the four term life policies totaled $2,500,000. Ms. Samy was the beneficiary on all the policies.

About four months after the state court litigation was initiated, in August 2020, Mr. Samy converted those term life insurance policies into the policies at issue here. The policies themselves indicate they are "replacements." The application Mr. Samy completed for each policy was with Prudential's "Pruco Life Insurance Company" and was an "Application for Life Insurance."[13] For each policy, Mr. Samy "prepaid" the premiums with significant outlays of money.[14] Rather than "whole life" policies as indicated in Debtors' Schedule C, and the phrase both parties used throughout the evidentiary hearing, the policies are instead variable universal life ("VUL") insurance policies.[15]

---

[13] *E.g.*, Debtor Ex. M2. Likewise, Mr. Samy received a welcome letter for his recent purchase of life insurance for each policy.

[14] The presentation of evidence on the four policies did not detail the amounts Mr. Samy paid for the policies, nor when the payments were made. From the Court's own review of the exhibits, the "gross premium paid" for each policy was $113,948.14 (policy #802), $675,383.66 (policy #502), $226,215.86 (policy #520), and $113,948.14 (policy #591). *See* Debtor Ex. K1. The premiums paid for the four policies totals $1,129,495.80.

[15] *E.g.*, Debtor Ex. M2 (Application for Life Insurance with Variable Supplement). In both whole life and variable life insurance policies, the owner "pays a premium that does not rise

The face amount of the death benefits for the four VUL policies again totaled $2,500,000; the same as the term life policies they replaced. Because of the significant premiums paid for the VUL policies, however, the death benefits on each will be higher.[16] Ms. Samy remains as the beneficiary on all the policies. Mr. Samy testified he converted the policies for security for his family, and because he thought the return on his investment would be better than if the funds were kept in a savings account.

The parties agree that because Mr. Samy prepaid his premiums by such a large amount, each of the four policies became a Modified Endowment Contract—a MEC. At the time he completed the conversion, Mr. Samy's understanding of the policies' MEC status was that they would retain their status as life insurance, with death benefits received by his beneficiary, and that the cash surrender value would accumulate tax free unless he took a pre-death distribution. In fact, Mr. Samy signed a "Notice Regarding Modified Endowment Contract" for each policy "to confirm receipt of information about modified endowment contracts (MEC)."[17] Each Notice stated:

---

with advancing age or deteriorating health." *In re Tyler*, No. 02-13597-JMD, 2004 WL 903826, at *1 (Bankr. D.N.H. Apr. 21, 2004). Both provide a death benefit and a cash value that builds over time. The two types of policies differ, however, because in a variable life policy, the owner chooses "the investment vehicle in which her premiums are invested and can switch among available options," and consequently, the cash value and death benefits of the policy can be variable. To contrast, in a whole life policy there is a "guaranteed rate of return on the policy's cash value, *id.*, the death benefit is not dependent on market performance because it is predetermined, and the cash value grows at a fixed rate.

[16] The parties did not give exact numbers, but counsel estimated the death benefits for the four policies are about $3,500,000 at present.

[17] *E.g.*, Cairo Ex. 5 p. P-000625. Each page of Cairo Exhibit 5 is the Notice page for each of the four policies at issue.

> About Modified Endowment Contracts
> Congress passed a law in 1988 which affects the taxation of certain life insurance policies. If the premium exceeds certain limits specified in the law, the policy is classified as a modified endowment contract.
>
> . . . Here is a brief summary of how a MEC will be reported for tax purposes.
> All MECs retain the most important advantage of life insurance:
> - The death benefits generally will be received by beneficiaries free of federal and state income taxes.
> - The cash surrender value will accumulate income tax-free, unless there is a pre-death distribution.
>
> However, pre-death distributions from a MEC are subject to less favorable tax treatment than distributions from a contract that is not a MEC. . . .
>
> Such distributions will be treated as taxable income to the extent there is a gain in the contract. There is a gain in the contract whenever the cash value exceeds the cost basis for the policy. In addition, a ten percent federal income tax penalty may apply to taxable income received before age 59½. . . .[18]

Debtors have made no payments on the policies since they were established.

A few weeks after completing the conversion, on September 9, 2020, Mr. Samy received a communication from Prudential on each of his policies confirming that because the premiums paid into the policies exceeded a specified maximum amount, the premium payments caused each policy to become a MEC. Mr. Samy was given the option to act to remove the policies' MEC status, but did not do so, and left the money in the policies so they all remained MECs.

Several years passed with no account activity. In September 2021, Mr. Samy did request what was described at the hearing, without explanation, as a rate reduction for the policies, but he was declined. Per Prudential's internal

---

[18] *Id.*

communications about the request, the declination was issued based on the need to maintain the policies as life insurance.[19]

On December 5, 2023, Mr. Samy signed a form from Prudential, requesting a withdrawal of $250,000 from policy #502. On the form, the box was checked that Mr. Samy did not want federal income taxes withheld. He testified that he later reported the withdrawal and paid taxes on the distribution.[20] Mr. Samy believes the funds were deposited in his bank account at First State Bank of Healy. Mr. Samy confirmed the funds were spent prepetition and no longer in his possession at the time of Debtors' bankruptcy filing.

About three months postpetition, on February 25, 2025, Mr. Samy signed a Request for Policy Loan form from Prudential, again from policy #502. In that form, Mr. Samy requested a "check for a policy loan of $60,000."[21] Again, the box was checked that he did not want federal income taxes withheld. Mr. Samy's signature appears under statements saying: "[I] acknowledge that I have received and read all pages of this form" and "[I] represent that no bankruptcy or insolvency proceedings are now pending against me."[22] Mr. Samy testified his insurance agent completed the form on his behalf, and he simply signed it without reading it.

---

[19] Cairo Ex. 6 p. 001007
[20] Cairo Exhibit 10 indicates Mr. Samy paid taxes on a $60,957 capital gain in tax year 2023. Cairo Ex. 10 p. 004133.
[21] Cairo Ex. 6 p. 000936. At the time, Mr. Samy was engaging new bankruptcy counsel, and he testified he requested the $60,000 for attorney fees.
[22] *Id.* p. 000938.

**9**

A $60,000 check was issued by Prudential two days later, on February 27, 2025. In the "Policy Loan Confirmation" statement, Prudential confirmed it processed a loan on the life insurance policy, the total policy debt would be $60,000, and Mr. Samy would be charged a 2% interest rate on the outstanding loan amount.[23] Mr. Samy testified he did not deposit the check or cash it, but rather, he held the check because he learned during the bankruptcy process that requesting the distribution while in bankruptcy was not the right thing to do and he was trying to figure out how to get the check back to Prudential to credit the loan. However, he acknowledged he had the right to cash the check at any time.

Ultimately, Mr. Samy contacted his local insurance agent who, on June 17, 2025, called Prudential to discuss returning the uncashed check and crediting it back to Mr. Samy's account. The next week, on June 25, 2025, Prudential sent a letter to Mr. Samy informing him the loan could not be reversed, but the check was "applied to reduce the outstanding loan" leaving his loan balance at $365.73 due to accrued interest.[24] Mr. Samy did not disclose the $60,000 check in any of his monthly operating reports, because in his view, he did not negotiate the check and returned it. Mr. Samy's belief is that he will pay tax on the distribution that was made, which he will coordinate with his tax accountants when his end-of-year financial and tax statements are prepared.

---

[23] *Id.* p. 000729.
[24] *Id.* p. 000940.

Per the statements from Prudential, the postpetition, $60,000 loan reduced the net cash value of policy #502 at the time it was outstanding from $462,510.81 to $402,403.29 and reduced the death benefit from $2,000,683.56 to a net death benefit of $1,940,576.04.[25] Per the Prudential statement dated July 1, 2025, after the $60,000 was returned and the outstanding loan balance was reduced to $365.93, the net cash value of the policy was $490,862.36 and the net death benefit was $2,029,035.11.[26]

### III.  Conclusions of Law

### A.  Jurisdiction and Burden of Proof

An objection to a claim of exemptions is a core matter under 28 U.S.C. § 157(b)(2)(B) (the "allowance or disallowance of . . . exemptions from property of the estate"), over which this Court may exercise subject matter jurisdiction.[27] Venue is proper in this District.[28]

Once an exemption is claimed, the property claimed exempt "is exempt" unless a party in interest objects.[29] In a challenge to a claimed exemption, the

---

[25] *Id.* pp. 000867-868.

[26] *Id.* As noted above, Debtors filed their Chapter 11 bankruptcy petition in November 2024. No evidence was introduced about the cash values of the four policies on that date.

[27] 28 U.S.C. §§ 1334(b), 157(a), (b)(1) and (b)(2)(G), and Amended Order of Reference, D. Kan. S.O. 13-1.

[28] 28 U.S.C. § 1409(a).

[29] 11 U.S.C. § 522(l) ("The debtor shall file a list of property that the debtor claims as exempt. . . . Unless a party in interest objects, the property claimed as exempt on such list is exempt.").

11

objecting party has the "burden of proving that an exemption was not properly claimed."[30]

### B. Objections to Exemptions Generally

When a debtor files a petition for bankruptcy relief, an estate is created.[31] That bankruptcy estate consists of "all legal or equitable interests of the debtor in property as of the commencement of the case."[32] Property of the estate is broad in scope.[33]

The Bankruptcy Code does, however, permit the exemption of certain property from that estate.[34] These exemptions are determined as of the petition

---

[30] Fed. R. Bankr. P. 4003(c) ("the objecting party has the burden of proving that an exemption was not properly claimed"); *In re Hodes,* 402 F.3d 1005, 1010 (10th Cir. 2005) (addressing the Kansas homestead exemption and concluding the "objecting party bears the burden of proof on an objection to a claimed exemption" by a "preponderance of the evidence"); *In re Lampe*, 331 F.3d 750, 754 (10th Cir. 2003) ("Once a debtor claims an exemption, the objecting party bears the burden of proving the exemption is not properly claimed.").

[31] 11 U.S.C. § 541(a)(1) ("The commencement of a case under . . . this title creates an estate.").

[32] *Id.*

[33] *In re Graves*, 609 F.3d 1153, 1156 (10th Cir. 2010); *see also Parks v. Dittmar (In re Dittmar)*, 618 F.3d 1199, 1207 (10th Cir. 2010) ("the scope of § 541 is broad and should be generously construed").

[34] *See* 11 U.S.C. § 522(b)(1) ("Notwithstanding section 541 of this title, an individual debtor may exempt from property of the estate the property listed in either paragraph (2) or, in the alternative, paragraph (3) of this subsection.").

12

date.[35] Even if a claim of exemption is amended, it is the petition date that controls for purpose of determining if the property is exempt.[36]

Kansas has opted out of using federal exemptions in favor of state-specific exemptions that are "applicable as of the filing date."[37] "When determining the validity of the exemption claimed under state law, the bankruptcy courts look to state law."[38] Under Kansas law, exemption statutes are to be liberally construed for the benefit of the debtor.[39] When interpreting a Kansas exemption statute, courts must first "examine the language used by the Kansas legislature."[40] "Language is given its common meaning if the unambiguous statutory language is not defined and the result is not absurd or contrary to the legislative purpose."[41] In addition,

---

[35] *In re Lampe*, 278 B.R. 205, 210 (B.A.P. 10th Cir. 2002), *aff'd*, 331 F.3d 750 (10th Cir. 2003) ("A debtor's right to an exemption is determined as of the date that the bankruptcy petition is filed."). *See also In re Robinson*, 295 B.R. 147, 153 (B.A.P. 10th Cir. 2003) ("The bankruptcy court correctly recognized that the bankruptcy petition date is the appropriate date on which to determine exemptions.").

[36] *See In re Gentry*, 459 B.R. 861, 864 (Bankr. M.D. Fla. 2011) ("In the case of amended claims of exemption, the amendment relates back to, and is effective as of, the petition date."). *See also In re Hight*, No. 02-41879, 2004 Bankr. LEXIS 1418, *5 (Bankr. D. Kan. Sept. 2, 2004) ("It is well-settled that in cases converted from Chapter 13 to Chapter 7, the facts as they exist on the date of filing are the facts pertinent to determine exemptions.").

[37] 11 U.S.C. § 522(b)(2)–(3); Kan. Stat. Ann. § 60-2312.

[38] *In re Garstecki*, 364 B.R. 95, 100 (Bankr. D. Kan. 2006).

[39] *Hodes v. Jenkins (In re Hodes)*, 308 B.R. 61, 65 (10th Cir. BAP 2004) ("Under Kansas law, exemption statutes are to be liberally construed in favor of those intended by the legislature to be benefitted."); *In re Hall*, 395 B.R. 722, 730 (Bankr. D. Kan. 2008) (stating "the Kansas Supreme Court has directed that exemption claims are to be liberally construed in favor of debtors").

[40] *In re Lampe*, 278 B.R. at 212.

[41] *In re Gregory*, 245 B.R. 171, 173 (B.A.P. 10th Cir.) (internal quotations omitted).

13

"[w]hen interpreting exemption statutes, the interpretation must further the spirit of such laws."[42]

### C. Objection to Exemption of the 2018 BMW

Under Kan. Stat. Ann. § 60-2304(c), debtors can exempt "[s]uch person's interest, not to exceed $20,000 in value, in one means of conveyance regularly used for the transportation of the person or for transportation to and from the person's regular place of work."[43] Under the statute, there are three elements that must be satisfied: Debtors "must have a property interest in the vehicle; the exempted portion must not exceed $20,000 in value; and the vehicle must be regularly used for the transportation of the Debtor or for transportation to and from the Debtor's place of work."[44] Only the third element is at issue.

As to the third element, Cairo argues the 2018 BMW is not "regularly used." Cairo points out the vehicle is kept at Debtors' home in Manhattan, which is not their primary residence, and Debtors primarily use other vehicles (the 2024 Tahoe and the 2024 Denali—neither of which Debtors claim as exempt). Debtors respond by pointing out the Kansas exemption does not require the exempted vehicle to be

---

[42] *Id.*; s*ee also Nohinek v. Logsdon*, 6 Kan. App. 2d 342, 344, 628 P.2d 257, 259 (1981) ("A statute is not to be given an arbitrary construction, according to the strict letter, but instead should be construed to advance the sense and meaning fairly deducible from the context. Moreover, a general rule regarding exemption laws is that they are to be liberally construed in favor of those intended by the legislature to be benefited and favorable to the purposes of the enactment.").

[43] The Kansas statutes governing exemption of a "means of conveyance" has remained largely unchanged since its adoption in 1965. *See In re Carpenter*, No. 02-12581, 2003 WL 23765954, at *2 (Bankr. D. Kan. Feb. 21, 2003) (detailing the history of the Kansas means of conveyance exemption).

[44] *In re Garstecki*, 364 B.R. at 106.

the only or primary means of transportation, and argue they satisfy the statutory requirement of "regular" use.

The Court must interpret and apply the phrase "regularly used" from Kan. Stat. Ann. § 60-2304(c). Two prior unpublished decisions from bankruptcy courts in the District of Kansas are illustrative. In *In re Hight*,[45] the debtors exempted a pickup truck and a motorcycle, which were two of six vehicles the debtors owned on the petition date, and two of the four vehicles the debtors claimed they regularly used on that date. In considering whether a debtor must "primarily" use a vehicle to claim an exemption in that vehicle, the bankruptcy court stated:

> Had the Kansas Legislature used a term such [as] 'exclusively used' or 'primarily used,' K.S.A. 60-2304(c) would clearly prohibit a debtor from claiming that more than one vehicle would qualify as exempt. However, the term 'regularly used' seems to imply a less restrictive requirement, one which would allow more than one vehicle to qualify for the exemption. Because the exemption laws are to be viewed liberally in favor of debtors, the Court must thus find that any ambiguity as to whether a debtor may 'regularly use' more than one vehicle must be resolved in favor of debtors. Therefore, if Debtors regularly used all four vehicles at issue in this matter, which the Trustee does not now dispute, then Debtors could have chosen any two of these four vehicles as exempt under K.S.A. 60-2304(c) at the time of filing.[46]

The court therefore permitted the debtors to amend their Schedule C to exempt the pickup and the motorcycle.[47]

Two years later, in *In re Hayes*,[48] the debtor again listed six vehicles as property, claiming an exemption in one of the vehicles (a Chevrolet Camaro) and

---

[45] No. 02-41879, 2004 Bankr. LEXIS 1418 (Bankr. D. Kan. Sept. 2, 2004).

[46] *Id.* at *9.

[47] *Id.* at *10.

[48] No. 05-19685, 2006 Bankr. LEXIS 2080 (Bankr. D. Kan. Aug. 25, 2006).

stating his intent to reaffirm the secured debt on two "significantly encumbered" vehicles (a Suburban and a Ford Explorer).[49] The creditor argued the debtor used "his other vehicles more frequently than the Camaro," and so therefore he could not claim a regular use of the Camaro.[50] Again, the bankruptcy court assessed primary versus regular use, and stated:

> 'Regular' is defined as 'customary, usual, or normal' or 'occurring at fixed intervals; periodic.' The debtor regularly uses the Camaro and is entitled to a liberal construction of the exemption laws. A car driven an average 500 miles per month in the town of Kingman is certainly in regular use. The statute does not require that the vehicle exempted be 'primary.' Nor should a court applying it concern itself with whether the vehicle the debtor chooses to exempt is lightly encumbered or free and clear of liens. What matters is that the vehicle is worth less than $20,000 and is either (i) the debtor's means of conveyance to his place of work; or (ii) be in regular use. The subjunctive structure of the statute permits the debtor to exempt a vehicle other than his means of conveyance to and from work, so long as it is 'regularly used.'

The court overruled the objection to exemption.[51]

Here, like the debtors in *Hight* and *Hayes*, the evidence shows customary, usual, periodic use. Debtors are at their Manhattan home two to three times a month, for a total of about four to five days a month. While there, Mr. Samy drives the 2018 BMW to his business operations. Ms. Samy drives it for personal use. Mr. Samy drives the vehicle eight to ten times a month, with Ms. Samy driving it about the same amount. Debtors estimate about two thousand miles a year are put on the vehicle. Like the debtors in *Hight*, Debtors here have additional vehicles they also

---

[49] *Id.* at *2.

[50] *Id.* at *4.

[51] *Id.* at *10.

16

use. But nothing in the Kansas exemption statute indicates a debtor is limited to primary or sole use: a debtor can exempt "one means of conveyance," but that does not mean they can only have one means of conveyance in their possession.

Cairo's arguments the 2018 BMW is a "luxury" vehicle and Debtors have two other vehicles they also use are simply not statutory considerations. The exemption is limited at $20,000, regardless of the make or model of the vehicle. A luxury vehicle valued at $52,000 and a non-luxury vehicle valued at $22,000 each receive the same exemption amount of $20,000. All the statute requires is "regular" use of the vehicle claimed exempt, and Debtors meet that standard here. The Court therefore overrules Cairo's objection to the exemption of the 2018 BMW.

### D.      Objection to Exemption of the Life Insurance Policies

Under Kan. Stat. Ann. § 60-2313(a)(7), debtors can exempt "[a]ny interest in any policy of insurance or beneficiary certificates upon a person's life exempt from process pursuant to K.S.A. 40-414." Kan. Stat. Ann. § 40-414 states in pertinent part:

> (a) If a life insurance company . . . issues any policy of insurance or beneficiary certificates upon the life of an individual and payable at the death of the insured, . . . the policy and its reserves, or their present value, shall inure to the sole and separate use and benefit of the beneficiaries named in the policy and shall be free from:
>
> > (1) The claims of the insured or the insured's creditors and representatives;
> >
> > (2) the claims of any policyholder or the policyholder's creditors and representatives, subject to the provisions of subsection (b);
> >
> > (3) all taxes, subject to the provisions of subsection (d); and

17

(4) the claims and judgments of the creditors and representatives of any person named as beneficiary in the policy of insurance.

(b) The nonforfeiture value of a life insurance policy shall not be exempt from:

(1) Claims of the creditors of a policyholder who files a bankruptcy petition under 11 U.S.C. § 101 et seq. on or within one year after the date the policy is issued; or

(2) the claim of any creditor of a policyholder if execution on judgment for the claim is issued on or within one year after the date that the policy is issued.

. . .

(d) Nothing in this section shall be construed as exempting from taxation any real estate which may at any time be carried by any life insurance company as a part of its legal reserve.

Cairo challenges the very nature of the four replacement policies at issue: do the converted policies still qualify as life insurance under the Kansas exemption statutes?

The Kansas exemption statutes do not define "life insurance." A review of a few of the cases discussing this Kansas exemption is helpful. In *In re Stutterheim*, the Chapter 7 debtors exempted an annuity under Kan. Stat. Ann. § 40-414(a) and a creditor objected.[52] The bankruptcy court concluded the annuity contract did not fall within the parameters of Kan. Stat. Ann. § 40-414(a) because it was not payable at the death of the insured to a person having an insurable interest in the life of the insured and was instead payable to the holder himself, did not contain "provisions affording traditional coverage for the death of the insured, such as payment to the spouse or other dependents," and did not pay "an amount sufficient to compensate .

---

[52] 109 B.R. 1010, 1010-11 (D. Kan. 1989).

. . for the loss of the services and companionship of the insured and/or burial expenses."[53] Rather, the bankruptcy court concluded the annuity was a "simple investment vehicle that offers a guaranteed return of the investment."[54] On appeal, the district court affirmed the bankruptcy court, focusing on the fact the annuity was not "issued upon the life of an individual."[55]

In *In re Barash*, the court assessed whether two policies purchased within a few months of a Chapter 7 petition qualified for the exemption provided by Kan. Stat. Ann. § 40-414(a).[56] Regarding the question of whether the insurance policies were "policies of insurance within the meaning of Kan. Stat. Ann. § 40-414,"[57] the bankruptcy court contrasted the policies at hand with other investment vehicles. The court concluded they would not fall within the exemption if "the purchase of the policies showed that the purchaser had no intent to provide for payment to his beneficiaries a sum certain, in the event of his untimely death, in return for moderate premium payments."[58] The court concluded the policies qualified as life

---

[53] *Id.* at 1011.

[54] *Id.* According to the district court, the "'death benefit'" provided by the annuity was simply repayment of the single premium plus accumulated interest in the event the annuitant died before the maturity date." *Id.* at 1011-12.

[55] *Id.* at 1013.

[56] 69 B.R. 231, 232 (Bankr. D. Kan. 1984).

[57] *Id.* at 233.

[58] *Id.* As examples, the bankruptcy court noted the following would *not* qualify for exemption as life insurance: "an endowment policy payable to the insured," "disability benefits payable to the insured," or "an annuity contract that pays periodically during the life of the annuitant or during a term fixed by contract with a death benefit representing a payment of the unpaid portion of the purchaser's investment." *Id.*

insurance because they were "payable to the members of the debtor's family and the benefit to be paid is considerably more than the cost of the policies."[59]

Here, Debtors' four policies are not payable to Mr. Samy, but rather are payable on death to Ms. Samy; she is the sole beneficiary. Ms. Samy holds the insurable interest in Mr. Samy's life. The policies have all the provisions "affording traditional coverage for the death" of Mr. Samy. They pay sufficient sums to compensate for the loss of services and companionship of Mr. Samy and for burial expenses. The policies provide a benefit payment upon death, in return for the premium payments made.

Cairo places great emphasis on the policies losing certain federal tax benefits because they are MECs due to Mr. Samy paying more up front in premiums than necessary to keep the policies in place. The "penalty" of a MEC is in part that, although paying more premiums than necessary is allowed in order to let the cash value earn interest tax free, if cash is withdrawn from the policy, it is taxed and can also incur a further penalty. However, absent actions taken by the policy holder that are not present in this case, the remaining value in such a policy retains its nature as a life insurance policy. Here, not only are the policies described as life insurance by the company selling them, that same company discussed how to ensure the policies "retained" their status as life insurance when Mr. Samy inquired about a rate decrease. Most importantly of course, as discussed above, the policies meet the core, fundamental qualities of life insurance.

---

[59] *Id.*

Cairo argues the death benefits are not just an amount "sufficient" to compensate Ms. Samy as in *Stutterheim* but instead are a lavish amount. Cairo notes the death benefits of the four policies are significant: totaling about $3.5 million. But the statute does not contain any limitation on dollar amount or value. The Kansas exemption statute exempts "any policy," without monetary caps.

Cairo also asserts the premium payments were not "moderate," as noted in *Barash*. The primary issue in the *Barash* case was the alleged "inequities" of that matter, and whether the exemption was lost based on the debtor's prepetition conversion of nonexempt to exempt assets.[60] Although Cairo does not make that exact argument here,[61] what Cairo does argue is that the policies are beyond what the Kansas legislature intended in its exemption for life insurance policies. Cairo notes Mr. Samy was already involved in state-court litigation with Cairo when the VUL policies were purchased, implying he improperly hid assets in the policies by prepaying the premiums in such significant amounts that the policies were categorized as MECs.

---

[60] 69 B.R. at 232-33.

[61] Factually, the court was not presented with evidence about conversion of nonexempt assets to exempt assets. It is clear the term life policies were converted to VUL policies, but other than that, the only evidence was that Mr. Samy paid the premiums for the new policies with funds from his personal accounts, he did not sell assets to obtain the cash, and he had cash in his accounts to pay the premiums. The parties did not provide the details of the premium payments through testimony, and although those details may have been within the exhibits admitted by stipulation, it is not this Court's role to search through voluminous exhibits to try to find details the parties did not think were significant enough to bring to the Court's attention. *See Cousik v. City & Cnty. of Denver*, No. 22-CV-01213-NYW-KAS, 2024 WL 896756, at *8 (D. Colo. Mar. 1, 2024) ("It is not this Court's role to . . . search the exceedingly voluminous case record for evidence in support of multiple potential theories of relief.").

21

Importantly, the conversion of the term life policies to VUL policies occurred more than *four years* prior to Debtors' bankruptcy. Second, as the *Barash* court pointed out, the legislature can limit (and has limited) the life insurance exemption. At the time *Barash* was decided, Kan. Stat. Ann. § 40-414 had just been amended so the exemption was not available for policies issued within one year of a bankruptcy filing if the policy was obtained "for the purpose of defrauding" a creditor.[62] In 1988, that "fraud" provision was *eliminated* from Kan. Stat. Ann. § 40-414. The current limitation in the statute is for any policy issued within one year of the bankruptcy filing.[63] Considerations about the "equities" of the policy are now absent from the statute: the limitation is now a calendaring matter. Debtors more than meet the one-year limitation.

The policies here are VUL policies converted from term life policies. They pay out upon death, to a beneficiary. The policies are life insurance by any measure.[64] As one court, nearly forty years ago stated: "It should be noted that the Kansas life insurance exemption statute is quite favorable for debtors. If this application of the

[62] 69 B.R. at 233. *See also In re Mueller*, 71 B.R. 165, 167-68 (D. Kan. 1987) (discussing 1984 amendment to Kan. Stat. Ann. § 40-414).

[63] Kan. Stat. Ann. § 40-414(b)(1) ("nonforfeiture value of a life insurance policy shall not be exempt from: (1) Claims of the creditors of a policyholder who files a bankruptcy petition . . . on or within one year after the date the policy is issued").

[64] *See, e.g.*, *In re Pikush*, 157 B.R. 155, 156–57 (B.A.P. 9th Cir. 1993) (discussing California statutes' definition of insurance and noting "California Insurance Code section 22 (West 1972) defines insurance as 'a contract whereby one undertakes to indemnify another against loss, damage, or liability arising from a contingent or an unknown event.' In the case of life insurance, the contingent or the unknown event is mortality."). *See also In re Tyler*, No. 03-13597, 2004 WL 903826, at *3 (Bankr. D.N.H. Apr. 21, 2004) (overruling the debtor's attempt to exempt his variable life insurance policy *as a retirement plan* under the state exemption for retirement plans, because there was "no question" the policy at issue was "a life insurance policy").

22

life insurance exemption statute seems harsh to creditors, the proper avenue of redress is an appeal to the Kansas legislature."[65] The same remains true today.

Finally, Cairo argues the postpetition $60,000 loan taken out by Mr. Samy from policy #502 is not exempt. An exemption exists, if at all, as of the date the bankruptcy petition was filed.[66] As of that date, the Kansas exemption statute permitted exemption of the "policy and its reserves" and "its present value."[67] In other words, on the petition date policy #502, from which the $60,000 loan was taken, was exempt in its entirety: from claims against the beneficiary, the insured, and any claims against the cash value of that policy.

While the proceeds of an exempt policy can also be exempt,[68] the policy loan does not meet the statutory parameters for an exemption under Kan. Stat. Ann. § 40-414.[69] Debtors made no claim of exemption for that policy loan, and for good reason—it did not exist on the petition date. To the contrary, the loan was incurred postpetition and it became property of Debtors' bankruptcy estate under 11 U.S.C. §

---

[65] *In re Douglas*, 59 B.R. at 841.

[66] *In re Lampe*, 278 B.R. 205, 210 (B.A.P. 10th Cir. 2002) ("A debtor's right to an exemption is determined as of the date that the bankruptcy petition is filed.")

[67] Kan. Stat. Ann. § 40-414(a).

[68] Kan. Stat. Ann. § 40-414 exempts the proceeds of the life insurance policy paid to a beneficiary, *In re Douglas*, 59 B.R. 836, 841 (Bankr. D. Kan. 1986), but does not carry over to nonexempt property which is purchased with the proceeds, *Indep. Sav. & Loan Ass'n v. Sellars*, 149 Kan. 652, 655, 88 P.2d 1059, 1062 (1939). The proceeds paid to a beneficiary may be held in a bank account or in a Certificate of Deposit and retain their exempt status, *In re Tessendorf*, 449 B.R. 793, 796 (Bankr. D. Kan. 2011), but do not retain exempt status if used to purchase an annuity, *In re Houser*, No. 03-13889, 2004 WL 2192603 (Bankr. D. Kan. Feb. 25, 2004).

[69] A loan against a life insurance policy is not itself a "policy of insurance" or "its reserves." Kan. Stat. Ann. § 40-414(a). Loan proceeds are not policy proceeds or death benefits paid out to a beneficiary upon the death of the insured. The statutory language controls here.

1115.[70] Although Mr. Samy did not cash the $60,000 check, he had full dominion and control over that check for four months.[71] The loan check was made out in Amro Samy's name and sent to his home address. Mr. Samy eventually directed his agent to return the check to Prudential, which could not "reverse" the loan, but rather applied the check to the loan balance.

The loan against the policy reduced the net cash value and the net death benefit of the policy while it was outstanding. While outstanding, the $60,000 was no longer part of the "policy and its reserves" as required to qualify for an exemption under Kan. Stat. Ann. § 40-414. Mr. Samy reduced Debtors' exempt variable life insurance policy by the $60,000 loan. The loan, while it was outstanding, reduced the net death benefit to which Ms. Samy would have been

---

[70] Section 1115(a) dictates that in Chapter 11 individual cases, "property of the estate includes, in addition to the property specified in section 541—(1) all property of the kind specified in section 541 that the debtor acquires after the commencement of the case."

[71] Although neither the parties nor the Court located case law with the same fact pattern found here, there are analogies that can be made with cases addressing loans from 401k or other retirement funds. For example, in *In re Jacobs*, the bankruptcy court analyzed a prepetition 401k loan to determine whether the funds were within the debtor's possession and control on the petition date such that they were property of the estate. 648 B.R. 403, 426 (Bankr. N.D. Okla. 2023). The *Jacobs* court utilized principles from cases such as *Parks v. FIA Card Servs., N.A. (In re Marshall)*, 550 F.3d 1251 (10th Cir. 2008), where the Tenth Circuit concluded loan funds were in the debtors' possession, and therefore property of the estate, because the debtors exercised control over the funds by directing the funds be paid to a second creditor. The *Jacobs* court concluded the loan proceeds were property of the estate upon issuance and did not become the debtor's property only after he used them, as the debtor contended, noting interest began accruing on the loan immediately upon issuance and the debtor had full control over the loan proceeds. 648 B.R. at 428. Likewise, in *In re Sullivan*, the bankruptcy court concluded a postpetition distribution from the debtors' exempt retirement funds lost its exempt status when it was not rolled over into an eligible fund as permitted by § 522(b)(4)(D)(ii), and because the funds were no longer exempt, they became property of the estate. 596 B.R. 325, 333 (Bankr. N.D. Tex. 2019). The Court concludes, like those cases, the $60,000 lost its exempt status upon issuance, because at that point Mr. Samy had full dominion and control over the check, and it was no longer part of an exempt life insurance policy or its reserves.

24

entitled had those death benefits become payable while the loan was outstanding—because her death benefits would have first paid off the loan. After Mr. Samy returned the check and repaid the loan, value was returned to the policy, but that value was new value—obtained postpetition with money that had become property of the estate upon its removal from the exempt life insurance policy and placed under the control of a non-beneficiary of that policy.[72]

The Court overrules Cairo's objection to Debtors' exemption of the four life insurance policies. The Court concludes, however, the $60,000 postpetition policy loan is not exempt.

## IV. Conclusion

Cairo's objection to Debtors' exemptions[73] is overruled in part. Debtors have properly claimed exemptions in their jewelry, the 2018 BMW, and the four life insurance policies. The $60,000 postpetition policy loan, however, is not exempt.

---

[72] Debtors' case is not like *In re Tessendorf*, where the debtor claimed an exemption in a certificate of deposit acquired with "the proceeds of an insurance policy on the life of his father." 449 B.R. at 794. The debtor in *Tessendorf* was the beneficiary of the life insurance policy, and although the analysis in *Tessendorf* begins with the broad statement that "Kansas law exempts the proceeds of a life insurance policy, whether they be cash or surrender value in the hands of the insured or proceeds in the hands of the beneficiary," the court noted the issue in the case was the "proceeds of an insurance policy in the hands of a beneficiary" and whether the deposit of those exempt funds in the certificate of deposit changed their nature from exempt to nonexempt. *Id.* at 794-95. The court overruled the objection to the exemption because the certificate of deposit was identifiable to and consisted solely of exempt insurance proceeds issued to the beneficiary of the life insurance policy. *Id.* at 795. A loan from a policy taken by the insured is distinguishable from proceeds of an insurance policy issued to the beneficiary of that policy upon the death of the insured.

[73] Doc. 126 (Objection to Property Claimed by the Debtors as Exempt and Incorporated Memorandum), Doc. 218 (Amended and Restated Objection to Property Claimed by the Debtors as Exempt and Incorporated Memorandum).

25

Any other objection previously raised to the exemption of additional property has been abandoned and is also overruled.

**It is so Ordered.**

# # #